**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MELISSA NEBLOCK and XODUS MOORE, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENE BY GENE, LTD., d/b/a FAMILYTREEDNA,<br><br>Defendant. | ) | Case No. 3:24-cv-50501 |

**DEFENDANT'S MOTION TO DISMISS FOR LACK**
**<u>OF PERSONAL JURISDICTION, COMPEL ARBITRATION OR TRANSFER VENUE</u>**

Defendant, Gene by Gene, Ltd., d/b/a Family Tree DNA ("FT" or "Defendant") by and through its attorneys, Chuhak & Tecson, P.C., files this Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, Compel Arbitration or Transfer Venue, in response to the Complaint filed by Melissa Neblock ("Plaintiff" or "Neblock") and Xodus Moore ("Moore"), and in support hereof, states as follows:

## I. INTRODUCTION

The Complaint ("Complaint", attached hereto as **Exhibit 1**) falsely alleges that FT violated the Illinois Genetic Information Privacy Act ("GIPA") by disclosing Plaintiffs' genetic testing results to third parties. Setting aside the inaccuracy the Complaint, FT lacks sufficient minimum contacts with Illinois to sustain personal jurisdiction. FT therefore seeks dismissal of this action pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Plaintiff Moore has voluntarily dismissed her claims without prejudice. Accordingly, this motion focuses on the allegations submitted by Neblock.

Neblock accepted FT's Terms of Service ("TOS") in 2017 ("2017 TOS"), which contained a binding arbitration clause. FT has demanded arbitration, and Plaintiff has rejected the demand. If the Court determines that it does possess personal jurisdiction over the Defendant, then FT respectfully requests an order that compels arbitration.

FT amended its TOS in April of 2024 and notified all customers that the TOS had been revised ("2024 TOS"). The 2024 TOS contains a clause that mandates the courts of Houston, Texas, as the exclusive venues for litigation between the parties. The 2024 TOS also provide FT with the option of submitting the dispute to binding arbitration. If the Court finds that the 2024 TOS govern this dispute, but declines to enforce the arbitration provision, then FT moves for transfer of the case to the Southern District of Texas, pursuant to 28 U.S.C.A. §1404(a).

## II. STATEMENT OF JURISDICTIONAL FACTS

Plaintiffs allege that their genetic testing information was disclosed by FT to Facebook and Google. **Ex. 1, ¶ 3**. The Complaint alleges that the unauthorized disclosures of genetic testing information occurred because FT installed third party tracking tools (such as pixels) on its website in Houston, Texas, causing the transfer of data to Google and Facebook. **Ex. 1, ¶ 90.**

Attached hereto as **Exhibit 2** is the Declaration of Alexander Zawisza, who serves as the Chief Financial and Administration Officer of FT, a Texas Domestic Limited Partnership with its principal place of business located in Houston. (**Ex. 2, ¶ 3**.). The genetic testing results of Family Tree customers are effectively protected from disclosure by multiple layers of encryption, and there is no evidence that the Plaintiffs' genetic testing results were disclosed to a third party. (**Ex. 2, ¶ 16).** All of the operations and technology for FT are located in the Houston office. ***Id***., **¶ 4**. FT has no operations in Illinois, and employees of FT are not required to travel to Illinois in order to perform their jobs. ***Id*, *par. 6.*** FT does not solicit business in Illinois, and FT does not employ any sales representatives in Illinois. ***Id*., ¶ 6 - ¶ 10**. In addition, FT does not solicit

business from Illinois customers, and it has no registered agent in Illinois. ***Id*.** FT does not maintain bank accounts or own property in Illinois, and it does not direct its activities at the residents of Illinois. ***Id*., ¶¶ 7-11**.

FT owns and operates a genetic testing laboratory in Houston that allows customers to purchase a DNA kit online, collect DNA samples, and then mail the kit to Houston for analysis and genetic testing results. ***Id*., ¶ 15**. FT genetic tests are conducted in compliance with state and federal law. ***Id*. ¶ 16**. FT policies and operational documents are located in the Houston office. ***Id*., ¶ 19**. If this case is litigated in Illinois, any trial testimony would require FT administrative and technical employees to travel to Illinois, thereby disrupting operations. ***Id*., ¶ 20**. The litigation and trial of this case in Illinois will create an undue hardship for FT. ***Id*, par. 21.**

Attached hereto as **Exhibit 3** is a true and correct copy of the Declaration of Daniel Au, Chief Information Technology Officer for FT. The engineering team at FT investigated Neblock's allegations and reviewed data regarding Neblock's use of the Family Tree website and genetic matching technology. **Ex. 3, ¶ 2.** Neblock first used the Family Tree website in 2015, but she did not purchase a kit using the 2015 account. ***Id*., ¶ 5.** Neblock created a second Family Tree account on February 10, 2017, and ordered a genetic test for what appears to be a male individual. ***Id*., ¶ 6.** Attached to the Daniel Au Declaration as **Exhibit 3A** is a copy of Neblock's 2017 account information. In order to create an account with Family Tree in 2017, Neblock was required to agree to the 2017 TOS, attached to the Daniel Au Declaration as **Exhibit 3B**. The Family Tree website required Neblock to agree to the 2017 TOS by clicking a box which stated "I agree", and notified Neblock that by clicking on the icon, she agreed to the TOS. **Exhibit 3C** is a screen shot of the image that was presented to Neblock when she agreed to the 2017 TOS as part of the account creation process at Family Tree. **Ex. 3, ¶ 9.**

In April of 2024, FT sent an email to all customers notifying them that FT had amended the applicable TOS. **Ex. 3, par. 10.** The 2024 TOS contained a venue selection clause that requires the litigation of any dispute between the parties in Houston, and also provided FT with the option of demanding binding arbitration. True and correct copies of the 2024 notification email and 2024 TOS are attached hereto as **Group Exhibit 3D.**

## III. ARGUMENT

### A. Overview of Personal Jurisdiction

Personal jurisdiction may only be found where a party has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Company v. Washington*, 326 U.S. 310, 316 (1945). Jurisdiction can be general or specific in nature. *Id*. Where the defendant is not incorporated or headquartered in the foreign state, and the defendant does not conduct its operations in the state, the Court lacks general personal jurisdiction over the Defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2017). In this case, the Court lacks general personal jurisdiction because FT is a Texas entity based exclusively in Houston. **Ex. 2**, **¶ 3**.

Plaintiffs must therefore establish specific personal jurisdiction based on a two-prong analysis. First, Defendant must have purposely availed itself of the privilege of doing business in Illinois. *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980). Second, the lawsuit must "arise out of or relate to" the defendant's activities by which it purposely availed itself transacting business in the foreign state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) "tests whether a federal court has personal jurisdiction over a defendant." *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1045 (N.D. Ill. 2015). When its existence is challenged, the plaintiff bears the

burden of establishing personal jurisdiction. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). Well-plead facts alleged in the complaint are taken as true, and any factual disputes in the affidavits are resolved in the plaintiff's favor. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Still, where the defendant "submits affidavits or other evidence in opposition, 'the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction.'" *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 818 (N.D. Ill. 2008) (quoting *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003)).

### B. The Facts do not Support Specific Personal Jurisdiction

In an effort to create a basis for personal jurisdiction, Plaintiff alleges multiple incorrect statements, as follows: (i) FT conducts business in Illinois; (ii) FT "advertised and sold" testing kits in Illinois; (iii) FT "committed tortious acts" in Illinois; and, (iv) FT "established contacts" in Illinois. **Ex. 1**, **¶ 36-37**. In reality, the only nexus between Plaintiff and Defendant arises out of Plaintiff's voluntary decision to utilize FT's website and genetic testing laboratory located in Houston, Texas.

The additional facts that defeat personal jurisdiction are as follows:

- FT is a Texas company with its only place of business located in Houston, Texas. **Ex. 2**, **¶ 3**.
- FT's genetic testing laboratory, website servers and corresponding operations are in Houston, Texas. **Ex. 2**, **¶ 4**.
- FT does not operate in Illinois, or send employees to Illinois to perform their job duties. **Ex. 2**, **¶ 4**, **6**.
- FT is not registered to do business in Illinois. **Ex. 2, par. 7**.

- FT does not market, advertise or otherwise solicit business in Illinois, or have sales representatives in Illinois. ***Id*, ¶¶ 8, 11**.
- FT has no registered agent, bank accounts or property in Illinois. **Ex. 2**, ¶ **9-10**.
- FT does not send marketing emails to Illinois specifically designed to generate new customers in Illinois, or use the U.S. mail service for the delivery of marketing publications in Illinois. **Id, ¶ 14.**
- FT revenue generated by Illinois customers from 2018-2023 was less than 3% of the company's total revenue. **Id, ¶ 13.**

Plaintiff's utilization of Defendant's resources in Houston can hardly be characterized as the Defendant's transaction of business in Illinois, merely because Plaintiff was located in Illinois when she accessed FT's website. FT's website and services are available to residents throughout the U.S. and multiple foreign countries. **Ex. 2, ¶ 12.** Because FT does not purposely avail itself of the privilege of transacting business in Illinois, the revenue generated by Illinois customers from 2018-2023 was less than 3% of Defendant's total revenue. ***Id.*, ¶ 13.**

As described in the Declaration of Daniel Au, Plaintiff expressly agreed to the 2017 TOS by clicking an icon labeled "I agree", which notified Plaintiff that by clicking on the icon she would be agreeing to the FT TOS in effect at that time. The 2017 TOS expressly provided that: "(i) the Services shall be deemed solely based in Texas; and (ii) the Services shall be deemed a passive one that does not give rise to personal jurisdiction over Gene by Gene, either specific or general, in jurisdictions other than Texas." **Ex. 3B, p. 9**. These contractual terms correctly recite the jurisdictional status between the parties, and made it clear to Plaintiff that the only courts that would have personal jurisdiction over FT would be Texas courts. Respectfully, the Court should enforce these terms. Generally, federal courts enforce online agreements so long as the website

presents the consumer with a realistic opportunity to review the terms of service, and include a physical manifestation of assent. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839-40 (S.D.N.Y. 2012)

In the Seventh Circuit, the operation of an interactive website is not sufficient to establish personal jurisdiction over the defendant. Instead, a finding of personal jurisdiction should not be made if the defendant has not engaged in other activities directed at the subject state. *Telemedicine Sols. LLC v. WoundRight Techs., LLC,* 27 F. Supp. 3d 883, 891 (N.D. Ill. 2014). In *Telemedicine*, the court granted defendant's motion to dismiss for lack of specific personal jurisdiction, reasoning as follows:

> "[I]n cases in which the defendant's alleged contacts with the forum state occurred online, the Seventh Circuit has noted that the relevant inquiry extends beyond simply operating an interactive website that is accessible from the forum state. Instead, the inquiry typically "boils down" to whether the defendant has **purposely exploited or in some way targeted the forum state's market. *be2 LLC v. Ivanov,* 642 F.3d 555, 558-559 (7th Cir. 2011). If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution.** *Id*." (emphasis added).

*Telemedicine*, 27 F. Supp. 3d at 891.

The holding in *Telemedicine* is fortified by the holding in *Matlin v. Spin Master Corp.*, 921 F.3d 701, 706 (7th Cir. 2019). *Matlin* states in relevant part:

> "In *Hemi Group* and other cases, we cautioned that courts [']should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates [an interactive] website that is accessible in the forum state.[' *Illinois v. Hemi Group LLC, 622 F.3d 754, 760 (7th Cir. 2010)]*; *be2 LLC*, 642 F.3d at 558; *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014). For a court performing a minimum-contacts analysis for [specific] personal jurisdiction purposes, **"[t]he relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." *Advanced Tactical Ordnance Sys.,* 751 F.3d at 801. The record must show that the defendants targeted the forum state. *be2 LLC,* 642 F.3d at 558–59.**"

*Matlin*, 921 F.3d at 706 (emphasis added).

The opinions cited above are on-point with the case at bar. FT operates a website and clinical laboratory exclusively within the confines of Houston. FT has not assigned any sales representatives to promote business in Illinois, and the company has not taken any steps to direct its activities at customers in Illinois. **Ex. 2**, **¶ 11**. Without evidence that FT has intentionally promoted business in Illinois, Plaintiff cannot establish that FT has "purposely availed" itself of the privilege of transacting business in Illinois by virtue of its website. Plaintiff initiated contact with FT by creating accounts with FT in Texas. This limited, online contact with FT in Texas is insufficient to create personal jurisdiction in Illinois.

The Seventh Circuit decision in *Advanced Tactical Ordinance v. Real Action Paintball*, 751 F.3d 796 (7th Cir.2014), merits consideration by the Court. In *Advanced Tactical*, the court reversed a preliminary injunction entered in favor of the plaintiff and dismissed the case for lack of personal jurisdiction over the defendant. The court noted that personal jurisdiction may not be exercised over the defendant unless "the defendant's suit-related conduct" creates a substantial nexus with the forum. *Advanced Tactical*, 751 F.3d at 801. The defendant maintained an email list and sent solicitation emails to potential customers in the forum state (Indiana). *Id.* at 803. Nonetheless, the court decided that the emails sent into Indiana, coupled with an interactive website, were insufficient to establish personal jurisdiction over the defendant.

In making this holding, the court maintained that:

> "[t]he interactivity of a website is also a poor proxy for adequate in-state contacts. We have warned that "courts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that the defendant is not haled into court simply because the defendant owns and operates a website that is accessible in the forum state, even if that site is interactive."

*Id.*

Plaintiff attempts to avoid well-established precedent via allegations concerning the FT website's use of cookies and pixels. In short, Plaintiff argues that Google cookies and/or Meta pixels related to her use of FT's website, amounts FT's conduct of business in Illinois, sufficient to confer specific personal jurisdiction over FT in Illinois (**Ex. 1**, **¶¶ 87-90**). Plaintiff's argument is at odds with the rulings of the Seventh Circuit. Further, the Complaint is devoid of factual allegations showing that Plaintiff's use of FT's website from Illinois, amounts to FT's presence in Illinois.

Indeed, Plaintiff's Complaint contradicts itself on this point by alleging that the "tracking technology" specific to a website is installed on the website. **Ex. 1**, **¶ 90**. Thus, according to Plaintiff, the alleged connection to Facebook or Google, to the extent any exists, is on FT's systems, located in Houston, Texas. **Ex. 2**, **¶ 4**.

Plaintiff falsely alleges that her genetic testing results were disclosed to third parties, such as Google and Facebook. That aspect of Plaintiff's case is science fiction. FT's Chief Financial and Administrative Officer and FT's Chief Information Technology Officer have rebutted this false allegation with the truth: the genetic testing results of FT customers are protected from disclosure through multiple layers of encription, and there is no evidence that Plaintiff's genetic testing results have been disclosed to any third party. **Ex. 2, ¶ 16; Ex. 3, ¶ 11.** Even if this corrosive and false allegation were true, any violations of GIPA occurred via the alleged tracking technology installed on Defendant's system located in Houston, Texas.

The record is bereft of evidence that FT purposely availed itself of the opportunity to conduct business in Illinois. Respectfully, for the reasons provided above, the Court should dismiss this case for lack of personal jurisdiction over FT.

### C. The Case should be Submitted to Binding Arbitration if the Court finds Personal Jurisdiction

If the Court decides that it does personal jurisdiction over FT, then both the 2017 TOS and the 2024 TOS support FT's demand for arbitration. The 2017 TOS provided that if any dispute related to the services by FT cannot be resolved, the Parties expressly agreed to "binding Arbitration by the American Arbitration Association (AAA) in the city of Houston, Texas under the commercial rules then in effect for the AAA, except as provided herein." **Ex. 3B, p. 9**. The only exception to mandatory arbitration was a carve out for FT to seek injunctive relief in order to protect proprietary interests. ***Id***. Plaintiff alleges that Defendant violated GIPA in the year 2019, accordingly, the 2017 TOS agreed to by Plaintiff should apply to this dispute.

The record confirms that Plaintiff agreed to the 2017 TOS when she created the 2017 account. In order to create her account and utilize the FT website, Plaintiff had to click on an icon that stated "I agree", which notified her that by clicking on the icon, she would be agreeing to the 2017 TOS. **Ex. 3, ¶ 9; Ex. 3C.** The sequence of events is similar to the sign-on process used in *Fteja v. Facebook, Inc.* 841 F.Supp.2d 829 (S.D.N.Y. 2012). In that case, the court enforced the terms of service because the existence of the terms was reasonably communicated to the user, and the user manifested assent to the online terms. *Id.* at 838.

In April of 2024, FT sent an email to Plaintiff and all users of the website notifying them that the Terms of Service had been amended. **Group Ex. 3D** is a copy of the April 11, 2024, notification email and 2024 TOS, which provides FT with the option of demanding Arbitration. **Ex. 3D, par. 14**. Thus, both the 2017 TOS and the 2024 TOS support Defendant's request for an order that compels arbitration.

The Federal Arbitration Act (FAA) reflects a "liberal federal policy favoring arbitration

agreements." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S.1, 24 (1983). The FAA supports "the fundamental principle that arbitration is a matter of contract." *Gore v. Alltel Communications, LLC*, 666 F3d. 1027, 1032-1033 (7th Cir. 2012). Federal cases should be stayed or dismissed, and the Court should issue an order compelling arbitration when one of the Parties refuses to comply with an arbitration agreement. *EEOC v. Waffle House, Inc.*, 534 U.S.279, 2889 (2002). Unless the court identifies procedural or substantive terms that are unconscionable, the court should order arbitration and any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration. *Sanchez v. Clean Net USA, Inc.*, 78 F.Supp.3d 747, 753 (N.D. Ill. 2015).

**D. If the Court does not Compel Arbitration, the Case should be Transferred**

If the Court does not enforce the arbitration clauses, then the Court should enforce the venue selection clause contained in 2024 TOS.

The 2024 TOS states as follows:

> All matters relating to the Services and these Terms, and any dispute or claim arising therefrom or related thereto (in each case, including non-contractual disputes or claims), shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction). Any legal suit, action, or proceeding arising out of, or related to, these Terms or the Services shall be instituted exclusively in the federal courts of the United States or the courts of the State of Texas, in each case located in the City of Houston and County of Harris, although we retain the right to bring any suit, action, or proceeding against you for breach of these Terms in your country of residence or any other relevant country. You waive any and all objections to the exercise of jurisdiction over you by such courts and to venue in such courts.

**Ex. 3D, par. 13.**

Settled law holds that a mandatory forum selection clause is "*prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Schwarz v. Sellers Markets, Inc.*, 812 F. Supp. 2d 932, 936–37 (N.D. Ill.

2011) (citing *M/S Bremen v. Zapata Off–Shore Co.,* 92 S.Ct. 1907 (1972). The Supreme Court construes this exception narrowly. Forum selection clauses are only unreasonable if: (i) their incorporation into the contract was the result of fraud, undue influence or unfair bargaining power; (ii) the selected forum is so gravely difficult and inconvenient that [the complaining party] will for all practical purposes be deprived of its day in court; or (iii) enforcement of the clauses would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision." *Id.* (citing *Bonny v. Soc'y of Lloyd's,* 3 F.3d 156, 160 (7th Cir.1993) (citation and internal quotation marks omitted)).

Here, there is no evidence to suggest that the 2024 TOS forum selection clause is unreasonable under the circumstances. First, the 2017 TOS, agreed to by Plaintiff, advised her that the TOS could be changed by FT via email notice to customers. **Ex. 3B, p. 8**. Second, the 2024 TOS provide a clear presentation of the forum selection clause, which is consistent with the arbitration clause in the 2017 TOS. There is no inference of fraud, undue influence or unfair bargaining. *See, Nw. Nat'l Ins. Co. v. Donovan,* 916 F.2d 372, 377 (7th Cir.1990) ("There was no burial in fine print here…The clause could of course be made even more conspicuous, but highlighted in this fashion it would throw the other clauses into shadow—inviting litigation over *their* validity.").

Further, the 2024 TOS forum selection clause, requiring either litigation or arbitration in Houston, will not make it "so gravely difficult and inconvenient" that Neblock would be deprived of her day in court. *Schwarz,* 812 F. Supp. at 938. Neblock had the opportunity to cease using FT services, or object to the 2024 TOS. Thus, "[w]hatever inconvenience" Neblock would suffer by being forced to litigate in Texas was foreseeable at the time she agreed to the forum

selection clause. *Id*. (citing *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 526 (7th Cir.2001).

Enforcement of the 2024 TOS forum selection clause would in no way contravene any law or public policy of this Court. Instead, said principles (namely, well-established contract law and the public policies behind it) weigh in favor of enforcing the clause. Neblock was not compelled to continue to use FT services after notice of the TOS changes in April of 2024.

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The Supreme Court has held that a "forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration ... nor no consideration ..., but rather the consideration for which Congress provided in § 1404(a)." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988).

In the Seventh Circuit, the "consideration for which Congress provided in § 1404(a)" has been found to reflect the view set forth by Justice Kennedy's concurrence in *Stewart*, which is that "a valid forum-selection clause is given controlling weight in all but the most exceptional cases." *Id.* at 33 (Kennedy, J., concurring).

A valid forum-selection clause requires district courts to adjust the usual § 1404(a) approach in three ways. *Midwest Biomedical Res., Inc. v. Breas Med., Inc.*, 2021 WL 2072129, at *4 (N.D. Ill. May 24, 2021) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63-65 (2013). First, the plaintiff's choice of forum receives no weight, and the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. *Id*. Second, the Court does not consider arguments about the parties'

private interests; the only relevant factors concern the public interest. *Id.* (internal citations omitted). "[B]ecause those factors are rarely strong enough to override the parties' preselected forum, the practical result is that forum-selection clauses should control except in unusual cases." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 894 (7th Cir. 2018). Third, a plaintiff who files suit in violation of a forum-selection clause enjoys no "privilege" with respect to the original venue's choice-of-law rules, and therefore it is entitled to no concomitant "state-law advantages." *Atlantic Marine*, 571 U.S. at 65. Not only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship. *Id*.

When applied to the instant case, the *Atlantic Marine* factors demonstrate that venue is appropriate in Texas as set forth in the 2024 TOS forum selection clause. There is no evidence that the TOS unfairly prejudice Neblock, or offend any corresponding law or public policy.

The court granted a motion to transfer venue in *Kelley v. MailFinance, Inc.*, 436 F. Supp. 3rd 1136 (N.D. Ill. 2020). "When parties have agreed to a valid forum selection clause, that clause should be given controlling weight in all but the most exceptional cases." *Kelley*, 436 F.Supp. at 1140, quoting *ATL. Marine Construction v. U.S. Dist. Court for the Western District of Texas*, 571 U.S. 49, 64 (2013). Due to the forum selection clauses at issue in this case, the following adjustments should be made to the Court's analysis based on §1404(a):

1. The Plaintiff's choice of forum should not be given any weight;
2. The Court should not consider arguments about the parties' private interests; and
3. The Court should only consider arguments related to public interest factors.

*Kelley*, 436 F.Supp. at 1140.

Even if the Court were to perform a *forum non-conveniens* analysis, the Southern District of Texas is the appropriate forum for the case. Virtually all of Defendant's administrative and engineering employees who will have to provide deposition and trial testimony related to the case are located in Houston. **Ex. 2, ¶ 20**. The documents, data and technology related to the case are also located in Houston. ***Id.*, ¶ 21**. If this case were to proceed to trial, the burden on the Defendant to require multiple employees to travel to Illinois would disrupt the day-to-day operations of FT, and create an undue hardship for a relatively small company. ***Id.* ¶¶ 23-24**.

## IV. CONCLUSION

FT has operated entirely within Texas, and Plaintiff has failed to establish personal jurisdiction over the Defendant. Accordingly, Defendant respectfully requests the dismissal of this action based on a lack of personal jurisdiction.

In the alternative, Plaintiff agreed to TOS in 2017 and 2024 that contained binding arbitration and class action waiver clauses. If the Court finds that it does possess personal jurisdiction over Defendant, then Defendant requests an order that compels arbitration. In the alternative, the case should be transferred to the U.S. District Court for the Southern District of Texas.

WHEREFORE, Defendant, Gene by Gene, Ltd., d/b/a Family Tree DNA, respectfully requests that the Court grant this motion, dismissing the action for a lack of personal jurisdiction over Defendant, or in the alternative, entering an order compels arbitration, or that transfers the case to the U.S. District Court for the Southern District of Texas, while the Court grants all other relief which the Court deems just and equitable.

Respectfully submitted,

GENE BY GENE LTD., D/B/A
FAMILY TREE DNA

Date: February 7, 2025

By: */s/ David J. Tecson* ____________

David J. Tecson (ARDC No. 6198108)
dtecson@chuhak.com
Adrienne M. Arlan
aarlan@chuhak.com (ARDC No. 6332417)
**CHUHAK & TECSON, PC**
120 S. Riverside Plaza, Suite 1700
Chicago, Illinois 60606
Telephone: 312-444-9300
Facsimile: 312-444-9027

## CERTIFICATE OF SERVICE

I, David J. Tecson, an attorney, hereby certify that on **January 29, 2025,** I electronically filed **DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, OR TO TRANSFER VENUE,** with the U.S. District Court for the Northern District of Illinois, Eastern Division's CM/ECF system, which will send electronic notification of this filing to the parties as set forth above.

*/s/ David J. Tecson*

# EXHIBIT

# 1

Case: 3:24-cv-50501 Document #: 1 Filed: 12/27/24 Page 1 of 12 PageID #:1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MELISSA NEBLOCK and XODUS MOORE**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**GENE BY GENE, LTD. d/b/a FAMILYTREEDNA**,<br><br>Defendant. | Case No. 3:24-cv-50501<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Melissa Neblock and Xodus Moore (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant Gene by Gene, Ltd. d/b/a FamilyTreeDNA ("FamilyTreeDNA" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. A person's genetic code is the single most sensitive piece of information pertaining to them. It can reveal a multitude of private facets of their life, including their health conditions, ethnic background, predisposition to cognitive and physical disorders, their parentage, and the parentage of their children.

2. Consequently, when individuals undergo genetic testing, they are subject to an inherent risk: if their genetic information is misused or improperly disclosed by a testing company, it can never be fully remedied. Unlike a credit card number, telephone number, or even a social

Case 3:24-cv-50501 Document #: 5 Filed: 12/27/24 Page 20 of 112 PageID #:146

security number, genetic information is immutable. It cannot be altered to preclude an individual with access from using it or sharing it with an unauthorized third party in the future.

3. Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant collects and transmits personally identifiable information regarding both the fact that its customers have been subject to genetic testing, and the results of that genetic testing (collectively, "Genetic Testing Information"), to third parties, including Alphabet, Inc. ("Google") and Meta Platforms, Inc. ("Facebook"), through its use of surreptitious online tracking tools.

4. Online advertising giants, like Google and Facebook, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If Google or Facebook receives information that a person is using genetic testing to research their ancestry or health conditions, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones related to other genetic testing products, as well as products and services related to the person's genetic results or health conditions.

5. Google and Facebook offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Meta Business Suite, and Facebook Ads (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google and Facebook's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. But, in exchange for access to these Business Tools, website operators install Google and Facebook's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google and Facebook use to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7. In essence, when website operators use Google and Facebook's Business Tools, they choose to participate in Google and Facebook's mass surveillance network and, in turn, benefit from Google and Facebook's collection of user data at the expense of their customers' privacy.

8. FamilyTreeDNA is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy by installing Google and Facebook's Tracking Tools on its website.

9. FamilyTreeDNA is a direct-to-consumer ("DTC") genetic testing kit provider. Over two-million people have entrusted Defendant with safeguarding the confidentiality of their most sensitive personal information by allowing it to sequence their DNA.[1]

[1] *Who is FamilyTreeDNA*, FAMILYTREEDNA, https://www.familytreedna.com/ (last visited Dec. 9, 2024, 2024).

10. To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its website, www.familytreedna.com (the "Website"), or from third-party retailer, and provide a saliva sample to the Defendant for its analysis.

11. To receive their genetic testing results, Defendant's customers, like Plaintiffs and Class Members, are required to register on Defendant's Website. When Defendant completes its genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

12. In its Privacy Statement, Defendant explicitly promises its customers, like Plaintiffs and Class Members, that it does "not share your Genetic Data with third parties for marketing purposes and will not use your Genetic Data for third-party marketing or personalized third-party advertising without your consent."[2]

13. Each of the Plaintiffs and Class Members visited the Website and had their personal Genetic Testing Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Genetic Testing Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Genetic Testing Information to be transmitted to the third parties, including the largest advertiser and compiler of user information, or the largest social media company on earth, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.[3]

---

[2] *Privacy Statement*, FAMILYTREEDNA, https://www.familytreedna.com/legal/privacy-statement (last visited Dec. 9, 2024, 2024).

[3] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of this year the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*,

Case: 3:24-cv-50501 Document #: 1 Filed: 12/12/24 Page 5 of 52 PageID #:5

14. Defendant's transmission of Plaintiffs' and Class Members' genetic testing information was not just contrary to its customers' reasonable expectation of privacy and its own Privacy Statement – it was also a violation of Illinois law.

15. In recognition of the highly sensitive nature of genetic testing information, several states have enacted legislation decreeing that genetic testing and information derived therefrom is confidential. These statutes, such as the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et. seq* ("**GIPA**") acknowledge that maintaining the confidentiality of genetic information is in the public interest.[4]

16. Consistent with this goal, GIPA provides strong legal protections to ensure that Illinois residents can take advantage of the knowledge that can be gained from obtaining personal genetic information, without fear that this same information could be disclosed to third parties without their consent.

17. GIPA prohibits DTC test kit companies like Defendant from sharing information derived from genetic tests, including the fact that an individual was the subject of a genetic test. Such information may be released only to the individual tested and to persons specifically authorized by the test subject.

18. Defendant chose to repeatedly disregard Illinois' genetic privacy laws by sharing consumers' confidential genetic information.

---

https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last visited Dec. 9, 2024).

[4] *See* 410 ILCS 513/5(2)-(3): "[M]any members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law[.]"; "The public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information."

19. Accordingly, Plaintiffs seek on behalf of themselves, and all of Defendant's other similarly situated employees in the state, an order: (i) requiring Defendant to cease the unlawful activities discussed herein; and (ii) awarding actual and/or statutory damages to Plaintiffs and the members of the proposed Class.

## II. PARTIES

***Plaintiff Melissa Neblock***

20. Plaintiff Neblock is a citizen of the state of Illinois, residing in DeKalb County and brings this action in an individual capacity, and on behalf of all others similarly situated.

21. In or around December of 2019, Plaintiff Neblock purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

22. Plaintiff Neblock reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

23. Plaintiff Neblock never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

24. On every occasion that she visited Defendant's Website, Plaintiff Neblock possessed accounts with Google and Facebook, and she accessed Defendant's Website while logged into her Google and Facebook accounts on the same device.

25. After providing her Genetic Testing Information to Defendant through the Website, Plaintiff Neblock immediately began seeing targeted online advertisements for genetic testing products.

***Plaintiff Xodus Moore***

26. Plaintiff Moore is a citizen of the state of Wisconsin, residing in Dane County and brings this action in an individual capacity, and on behalf of all others similarly situated.

27. In or around September of 2022, Plaintiff Moore purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

28. Plaintiff Moore reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

29. Plaintiff Moore never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

30. On every occasion that she visited Defendant's Website, Plaintiff Moore possessed accounts with Google and Facebook, and she accessed Defendant's Website while logged into her Google and Facebook accounts on the same device.

31. After providing her Genetic Testing Information to Defendant through the Website, Plaintiff Moore immediately began seeing targeted online advertisements for genetic testing products.

32. Defendant Gene by Gene, Ltd. d/b/a FamilyTreeDNA is a limited company incorporated in the State of Texas with its principal place of business at 1445 North Loop West, Suite 820, Houston, TX 77008, in Harris County.

Case 3:24-cv-50501 Document #: 1 Filed: 12/17/24 Page 8 of 52 PageID #:8

## III. JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

34. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

35. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

36. This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in the State of Illinois, and because Defendant has advertised and sold its DTC genetic test kits to consumers in the State of Illinois and in this judicial district.

37. Personal jurisdiction is also proper because Defendant committed tortious acts in the State of Illinois and this judicial district and Plaintiffs' claims arise out of such acts, and/or because Defendant has otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction.

38. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV. THE ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")

39. During the 1990s, the U.S. government poured billions of dollars into the Human Genome Project in an attempt to map the entire human genetic code. When President Clinton announced the first successful "rough draft" of the Project in 2000, he hailed it as one of the great

achievements of human history, and said: "Today we are learning the language with which God created life[.]"[5]

40. However, like any great leap in human understanding, learning the meaning of people's genetics came with many concerns. One movie released around this time, the dystopian science fiction movie *Gattaca*, attempted to show how this new technology could be abused. The movie conjured a not-too-distant future where genetic discrimination was rampant. In the movie, companies segregated people based on their genetic profiles, those with better genetic profiles (i.e., genetically engineered humans) were eligible for professional employment, while others with less desirable genetics (e.g., susceptibility to heart disease or cancer) were unemployable or relegated to menial jobs. Since its release, the film has been regularly used in schools to show the possible misuses of genetic information.[6]

41. Illinois stood at the forefront of protecting its citizens from the abuse of this technology when it first passed GIPA in 1998. According to the Illinois Legislature, the intent of GIPA is to encourage the public to embrace genetic testing by eliminating any perception that genetic information gleaned from those tests (such as family medical history) could later be demanded from and/or used against them. Limiting "requests for [] protected health information to the minimum necessary to accomplish an intended purpose … is a key component of health information privacy." 410 ILCS 513/5(5).

---

[5] Nicholas Wade, *Scientists Complete Rough Draft of Human Genome*, NEW YORK TIMES (June 26, 2000), *available online at*: https://archive.nytimes.com/www.nytimes.com/library/national/science/062600sci-human-genome.html?amp;sq=francis%252520collins&st=cse&scp=23.

[6] Hannah Docter-Loeb, *What Do People Who Work in Genetics Think About Gattaca 25 Years After Its Release*, SLATE (Aug. 15, 2022), https://slate.com/technology/2022/08/gattaca-25th-anniversary-genetics-crispr.html (last accessed Dec. 9, 2024).

42. The Illinois Legislature amended GIPA in 2020 to increase its protections by updating the statute's definition of "genetic testing" to include direct-to-consumer commercial genetic testing kits, such as those sold by Defendant, leaving no doubt that such information gleaned therefrom is regulated by the statute. See 110 P.L. 0132.[7]

43. During discussions of the 2020 GIPA amendments, the Illinois Legislature unanimously recognized the importance of safeguarding genetic information in the hands of commercial testing companies such as Defendant:

> I hope the [legislature] understands the importance of [family medical history]; it's becoming more and more important. Back in '96 or '97, I had a third generation ovarian cancer survivor that came to me with this issue. … If a woman has … the gene that causes breast cancer, she can have up to an 84 percent probability that she will develop breast cancer sometime in her life … it's important that we help people be able to know that information and know they won't be discriminated against in their employment …. Quite honestly, with genetic information we have today, we could identify a pool of people that … no one would want to employ. [GIPA] helps guarantee that we don't have that kind of discrimination occur.

Illinois House Transcript, 2008 Reg. Sess. No. 276, pp. 33-34.

44. GIPA bars companies such as Defendant from sharing genetic information with unauthorized third parties. Specifically, GIPA states: "Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." 410 ILCS 513/15(a).

[7] *Public Act 101-0132*, Ill. Gen. Ass. (2020), *available online at*: https://www.ilga.gov/legislation/publicacts/101/PDF/101-0132.pdf.

45. GIPA further provides: "No person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30(a).

46. A company providing direct-to-consumer commercial genetic testing is prohibited from sharing any genetic test information or other personally identifiable information about a consumer with any health or life insurance company without written consent from the consumer. 410 ILCS 513/20(e).

47. In order to enforce these and other requirements, GIPA provides individuals with a broad private right of action, stating: "Any person aggrieved by a violation of this Act shall have a right of action … against an offending party." 410 ILCS 513/40(a). Under this private right of action, a party may recover, for each violation: (a) $2,500 or actual damages, whichever is greater, for a negligent violation, or $15,000 or actual damages, whichever is greater, for a willful violation; (b) reasonable attorneys' fees; and (c) "[s]uch other relief, including an injunction, as the … court may deem appropriate." *Id.*

48. Plaintiffs are not required to allege or prove actual damages in order to state a claim under GIPA, and they can seek statutory damages under GIPA as compensation for the injuries caused by Defendant. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, at ¶ 40, 432 Ill. Dec. 654, 129 N.E.3d 1197 (holding by the Illinois Supreme Court that "an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under [the Illinois Biometric Privacy Act ("**BIPA**")] in order to qualify as an 'aggrieved person' under BIPA); *see also Bridges v. Blackstone Grp., Inc.*, 2022 U.S. Dist. LEXIS 121205, at *8 (S. D. Ill. July 8, 2022) (holding that it is appropriate to apply BIPA's definition of "aggrieved person" used by the *Rosenbach* court to alleged violations of GIPA).

49. Thus, GIPA provides valuable privacy rights, protections, and benefits to the citizens of Illinois and provides those citizens with the means to aggressively enforce those rights.

## V. FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a. Google and Facebook's Mass Advertising Surveillance Operation

50. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[8] In 2023, Google's advertising revenue of $238-billion accounted for 77-percent of its total revenue for the year.[9]

51. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[10] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[11]

[8] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Dec. 9, 2024).

[9] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Dec. 9, 2024).

[10] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Dec. 9, 2024).

[11] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Dec. 9, 2024).

52. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[12]

53. Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[13]

54. Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117-billion, roughly 97-percent of which was derived from the sale of digital advertisements.[14]

55. Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[15]

56. But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives

---

[12] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Dec. 9, 2024).
[13] *Id.*
[14] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Dec. 9, 2024).
[15] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last visited Dec. 9, 2024).

information from [third-party] businesses and organizations," such as Defendant, and uses that information to sell targeted advertising.[16] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[17]

57. While Google and Facebook admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of Google and Facebook's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendant was part of Google and Facebook's surveillance network. Moreover, as Defendant does not disclose its use of Google and Facebook's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google and Facebook's privacy statements in connection with their use of the Website

58. Google and Facebook aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[18] With these advertising profiles, Google and Facebook can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation),

[16] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last visited Dec. 9, 2024).
[17] *Id.*
[18] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[19]

59. Google and Facebook's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[20] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[21]

60. Moreover, as in this case, the data collected by Google and Facebook often pertains to the most personal and sensitive aspects of an individual's life. For example:

i. 93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[22] In fact, Google advertising trackers were found on 73-percent of pornography websites.[23]

ii. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[24]

---

[19] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Dec. 9, 2024); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last visited Dec. 9, 2024).

[20] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Dec. 9, 2024).

[21] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last visited Dec. 9, 2024).

[22] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[23] *Id*.

[24] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

iii. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[25] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[26]

iv. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[27]

61. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[28] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[29]

---

[25] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Dec. 9, 2024).

[26] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Dec. 9, 2024).

[27] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last visited Dec. 9, 2024).

[28] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Dec. 9, 2024).

[29] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last visited Dec. 9, 2024).

62. In fact, Google and Facebook value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[30]

63. When website operators, like Defendant, make use of Google and Facebook's Business Tools, they are essentially choosing to participate in Google and Facebook's mass surveillance network, and in return they benefit from Google and Facebook's collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[31] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[32]

64. In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[33] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[34]

---

[30] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Dec. 9, 2024) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last visited Dec. 9, 2024) ("Meta Business Suite is a free tool").

[31] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Dec. 9, 2024).

[32] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Dec. 9, 2024).

[33] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[34] *Id*.

65. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[35]

**b. Pixels Can Record Almost Every Interaction Between a User and a Website**

66. In order to use Google and Facebook's Business Tools, Defendant installed Google and Facebook's Tracking Tools, including tracking Pixels, onto its website.

67. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[36]

68. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer,

---

[35] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[36] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Dec. 9, 2024).

the text entered by the user into a website search bar, and even the information provided by the user on an online form.[37]

69. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[38]

**c. The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google and Facebook**

70. Every website is hosted by a computer "server" that holds the website's contents.

71. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

72. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link,

---

[37] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Dec. 9, 2024); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Dec. 9, 2024).

[38] *Lurking Beneath the Surface, supra* note 35.

and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

73. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[39] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[40] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[41]

74. When a Google/Facebook user logs onto their account, their web browser records a Google/Facebook tracking cookie.[42] These cookies include a specific line of code that links the web browser to the user's Google/Facebook account.[43]

75. Google and Facebook's Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

---

[39] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Dec. 9, 2024).
[40] *Id.*
[41] *Id.*
[42] Cyphers, *supra* note 17.
[43] *Id.*

76. Simultaneously, the Google and Facebook Pixels, like those installed on Defendant's Website, request identifying information from any Google and Facebook cookies previously installed on the user's web browser.

77. The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google and Facebook. As a result, Google and Facebook can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google or Facebook profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with Google and Facebook, can know the user's identity.

78. A remarkable number of Americans possess a Google or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[44] And just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[45] When these users visit a website, like Defendant's, that utilizes a Google or Facebook Pixel, any information collected by the Pixel can be linked to the user's identity through the Google and Facebook cookies installed on the user's web browser.

79. However, it is not only Google and Facebook account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google and Facebook utilize

[44] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited Dec. 9, 2024).
[45] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Dec. 9, 2024) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Dec. 9, 2024).

sophisticated data tracking methods to identify even those few users who do not have a Google or Facebook account.

80. Google and Facebook's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

81. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[46] By tracking this browser fingerprint, Google and Facebook are able to compile a user's activity across the internet.[47] And, as Google and Facebook continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**d. Defendant Disclosed Plaintiffs' and Class Members' Genetic Testing Information to Google and Facebook**

82. Defendant's genetic testing service uses genomic testing to generate information on a customer's ancestry, ancestral origin, DNA relatives, and health traits and predispositions. To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its Website, or a third-party retailer, and provide a saliva sample to the Defendant for its analysis.

83. To receive their genetic testing results, Defendant's customers, like Plaintiffs and Class Members, are required to register on Defendant's Website. When Defendant completes its genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

---

[46] Cyphers, *supra* note 17.
[47] *Id*.

84. Defendant's standard 'Family Finder' genetic test provides Defendant's customers with several different data points, including:

i. The *myOrigins* analysis, which analyzes the customer's autosomal DNA to determine the likely geographic origin of the customer's ancestors;

ii. The *FamilyFinder* analysis, which identifies individuals in Defendant's database that may be closely related to the customer; and

iii. The *Haplogroup Story* analysis, which analyzes genetic information passed down through the Y-chromosome.

85. Unbeknownst to Plaintiffs and Class Members, Defendant intentionally configured the Google and Facebook Pixels installed on its Website to capture and transmit their genetic testing results to unauthorized third parties, including Google and Facebook.

86. The following screenshots ("Figures 1 & 2") show that when Defendant's customers view their *myOrigins* analysis, the information requested and transmitted to Google by the Google Pixels installed on Defendant's website include the fact that Plaintiffs and Class Members are viewing the results of DNA ancestry testing.

87. Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to the user's identity. As the screenshots show, Defendant's website transmitted the identifier number attached to Google's '_cid' cookie, which identifies the user's Google account. Defendant's website also transmitted information that is commonly used to create a browser fingerprint, such as the user's screen resolution, operating system software and version number, web browser software and version number, and microprocessor type.







*Figures 1 & 2. Screenshots depicting back-end network traffic from Defendant's Website which show information transmitted to Google*

88. Defendant transmits even more information about users when they view their *Haplogroup Story* analysis. As the following screenshots ("Figures 3 & 4") show, when Defendant's customers view their *Haplogroup Story* analysis, Defendant's website transmits the user's specific haplogroup to Google – in this case, the user's designation as belonging to haplogroup R-Y6.[48] Along with the user's haplogroup designation, Defendant also transmitted the

[48] Haplogroups are heritable genetic markers which correlate with specific ancestral groups and may be used to identify susceptibility to certain diseases, including Parkinson's and Alzheimer's. *See*, *e.g.,* M. Christina Kenney, Deborah A. Ferrington & Nitin Udar, *Mitochondrial Genetics of Retinal Disease*, *in* RETINA (Elsevier 2013), *available online at*: https://www.sciencedirect.com/science/article/abs/pii/B9781455707379000321.

identifying information linked to Google's '_cid' cookie, and information commonly used to generate a browser fingerprint, such as the user's language settings, screen resolution, and time zone.







*Figures 3 & 4. Screenshots depicting back-end network traffic from Defendant's Website which show information transmitted to Google.*

89. Defendant also transmits user information to Facebook every time a customer visits its website. The below screenshot ("Figure 5") shows that the Facebook Pixels on Defendant's website inform Facebook of every time that a user visits Defendant's website, along with the identifying information linked to Facebook's '_fbp' cookie, which identifies the user's Facebook account, and information commonly used to generate a browser fingerprint, such as the user's screen resolution.


Headers Payload Preview Response Initiator Timing Cookies

▾Query String Parameters view source view URL-encoded


id: 2165360733726777
ev: PageView
dl: https://www.familytreedna.com
rl: https://www.familytreedna.com
if: false
ts: 1731421307590
sw: 1920
sh: 1080
v: 2.9.176
r: stable
a: tmSimo-GTM-WebTemplate
ec: 0
o: 4124
fbp: fb.1.1730997379942.802698551616578061
cs_est: true
pm: 1
hrl: 1b321d
ler: empty
cdl: API_unavailable
it: 1731421307367
coo: false
tm: 1
cs_cc: 1
cas: 6300218403386163,2938631792882064,2430093500358440,2110213879024530,2060781853976555,1945986555484936
rqm: GET


*Figures 5. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Facebook.*

90. By installing third-party Tracking Tools, including tracking Pixels, on its Website, Defendant knowingly and intentionally caused Plaintiffs' and Class Members' Genetic Testing Information to be transmitted to third parties, including Google and Facebook.

## B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' GENETIC TESTING INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### a. Defendant failed to inform Plaintiffs and Class Members of its disclosure of their Genetic Testing Information to Third Parties, in violation of its Privacy Statement.

91. Defendant's Privacy Statement informs its customers of all of the ways that it uses their "Genetic Data," defined as a customer's "DNA Sample and any information derived from it as well as self-reported health information[.]"[49] In its Privacy Statement, Defendant states that it

[49] *Privacy Statement*, FAMILYTREEDNA, https://www.familytreedna.com/legal/privacy-statement (last visited Dec. 9, 2024, 2024).

will use a customer's Genetic Data only to process the customer's DNA sample, conduct genetic analysis and genetic matching, provide genealogical and health insights to the customer, and conduct internal research.[50] Moreover, Defendant's Privacy Statement explicitly promises its customers, like Plaintiffs and Class Members, that it does "not share your Genetic Data with third parties for marketing purposes and will not use your Genetic Data for third-party marketing or personalized third-party advertising without your consent."[51]

92. All of these promises were lies. In truth, Defendant breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Genetic Testing Information to third parties, including Google and Facebook.

93. Plaintiffs and Class Members had a reasonable expectation of privacy, based partly on Defendant's own representations to Plaintiffs and the Class, that Defendant would not disclose their Genetic Testing Information to third parties. Defendant did not inform Plaintiffs that it was sharing their Genetic Testing Information with third parties, including Google and Facebook.

94. By engaging in this improper sharing of their Genetic Testing Information without Plaintiffs' and Class Members' consent, Defendant violated its own Privacy Statement and breached Plaintiffs' and Class Members' right to privacy, including under GIPA, by unlawfully disclosing their use of its genetic testing service and the results of their genetic testing.

95. Knowing just how invasive it can be when a user's Genetic Testing Information is disclosed without consent, Facebook explicitly stated, in an action pending against Facebook related to use of its Meta Pixel on a healthcare provider's Website, that it requires Facebook Pixel users to "post a prominent notice on every page where the pixel is embedded and to link from that

[50] *Id.*
[51] *Id.*

notice to information about exactly how the pixel works and what is being collected through it, so it is not invisible."[52] Defendant did not abide by this policy.

96. Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as Google and Facebook to intercept Plaintiffs' and Class Members' Genetic Testing Information and use it for advertising purposes.

97. Despite a lack of disclosure, Defendant allowed third parties such as Google and Facebook to intercept Plaintiffs' and Class Members' Genetic Testing Information, and use it for advertising purposes, in violation of its own Privacy Statement.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a. Defendant Received Material Benefits in Exchange for Plaintiffs' Genetic Testing Information

98. As explained, *supra*, users of Google and Facebook's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google and Facebook's Tracking Tools on their website.

99. Upon information and belief, Defendant, as a user of Google and Facebook's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google and Facebook to collect Plaintiffs' and Class Members' Genetic Testing Information.

[52] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig*., 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

**b. Plaintiffs' and Class Members' Data Had Financial Value**

100. Moreover, Plaintiffs' and Class Members' Genetic Testing Information had value, and Defendant's disclosure and interception of that Genetic Testing Information harmed Plaintiffs and the Class.

101. According to Facebook's annual reports, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[53]

102. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

103. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

104. Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between ages 13 and 35.

---

[53] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Dec. 9, 2024).

105. The unauthorized disclosure of Plaintiffs' and Class Members' private and Genetic Testing Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

**D. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

106. At all times when Plaintiffs and Class Members provided their Genetic Testing Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share their Genetic Testing Information with third parties for a commercial purpose, unrelated to providing the DNA analysis that Plaintiffs and Class Members contracted with Defendant to receive.

107. Privacy polls and studies show that an overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares that individual's data to be one of the most important privacy rights.

108. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[54]

109. With regards to genetic testing specifically, the top two factors that Americans state as being important in making the "decision to participate in genetic research" are "[c]onfidentiality: knowing that your information will not be shared without your consent" and

---

[54] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Dec. 9, 2024).

"[p]rivacy: knowing that your information will not be shared publicly.[55] In fact, more than half of Americans believe that the results of DTC genetic testing should not even be shared with law enforcement for the purpose of helping to solve crimes.[56]

110. Personal data privacy and obtaining consent to share Genetic Testing Information are material to Plaintiffs and Class Members.

## VI. TOLLING AND ESTOPPEL

111. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google and Facebook's Tracking Tools into its Website.

112. The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

113. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

114. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

115. Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by viewing their genetic testing results through Defendant's Website, Plaintiffs'

[55] *U.S. Public Views of Genetics: An ASHG Survey*, AMERICAN SOCIETY OF HUMAN GENETICS (Jan. 29, 2020), *available online at*: https://www.ashg.org/discover-genetics/public-views-of-genetics-survey/.

[56] Andrew Perrin, *About half of Americans are OK with DNA testing companies sharing user data with law enforcement*, PEW RESEARCH (Feb. 4, 2020), https://www.pewresearch.org/short-reads/2020/02/04/about-half-of-americans-are-ok-with-dna-testing-companies-sharing-user-data-with-law-enforcement/ (last accessed Dec. 9, 2024).

and Class Members' Genetic Testing Information would be disclosed or released to unauthorized third parties, including Google and Facebook.

116. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Genetic Testing Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Genetic Testing Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

117. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

118. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

119. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

120. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of a separate Illinois Subclass, which is defined as follows:

**Illinois Subclass**

All natural persons who used Defendant's Website to view their genetic testing results in Illinois and whose Genetic Testing Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

121. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

122. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

123. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

124. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Genetic Testing Information of Plaintiffs and Class Members;

b) Whether Defendant had duties not to disclose the Genetic Testing Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class members that their Genetic Testing Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Genetic Testing Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Genetic Testing Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Genetic Testing Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Genetic Testing Information.

125. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Genetic Testing Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

126. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

127. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, including Google and Facebook, in the same way. The common issues arising from Defendant's conduct affecting Class

Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

130. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Genetic Testing Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Genetic Testing Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Genetic Testing Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

131. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**VIOLATION OF 410 ILCS 513/15**
**FAILURE TO MAINTAIN CONFIDENTIALITY OF GENETIC INFORMATION**
***(On Behalf of Plaintiff Neblock and the Illinois Subclass)***

132. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

133. Plaintiff Neblock and Illinois Subclass Members were individually asked to provide, and did provide, their genetic information to Defendant for the purpose of a genetic test in Illinois.

134. Defendant released information derived from Plaintiff Neblock's and Illinois Subclass Members' genetic tests to unauthorized third parties, including Google and Facebook, in exchange for marketing and advertising services.

135. Plaintiff Neblock and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from their genetic tests with any third party.

136. Plaintiff Neblock and Illinois Subclass Members were aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized third parties.

137. By disclosing information derived from the genetic tests of Plaintiff Neblock and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff Neblock's and Illinois Subclass Members' rights to privacy in their genetic information as set forth in GIPA.

138. Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff Neblock and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

139. On behalf of herself and the proposed Illinois Subclass, Plaintiff Neblock seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff Neblock and the proposed Illinois Subclass by requiring Defendant to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

**<u>COUNT II</u>**
**VIOLATION OF 410 ILCS 513/30**
**UNAUTHORIZED DISCLOSURE OF GENETIC TEST RESULTS AND IDENTITIES**
***<u>(On Behalf of Plaintiff Neblock and the Illinois Subclass)</u>***

140. Plaintiffs repeat and reallege the allegations contained in paragraphs 132 through 139 as if fully set forth herein.

141. Plaintiff Neblock and Illinois Subclass Members were asked to provide, and did provide, their genetic information to Defendant for the purpose of a genetic test in Illinois.

142. Defendant released information derived from Plaintiff Neblock's and Illinois Subclass Members' genetic tests to unauthorized third parties in exchange for marketing and advertising services.

143. Plaintiff Neblock and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from their genetic test with any third party.

144. Plaintiff Neblock and Illinois Subclass Members were aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

145. By disclosing information derived from the genetic tests of Plaintiff Neblock and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff Neblock's and Illinois Subclass Class Members' rights to privacy in their genetic information as set forth in GIPA.

146. Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff Neblock and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

147. On behalf of herself and the proposed Illinois Subclass, Plaintiff Neblock seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff Neblock and the Illinois Subclass by requiring Defendant to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

## COUNT III
## COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois Subclass)***

148. Plaintiffs repeat and reallege the allegations contained in paragraphs 140 through 147 as if fully set forth herein.

149. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Genetic Testing Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

150. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services

therein.

151. Plaintiffs and Class Members communicated Genetic Testing Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

152. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

153. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

154. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

155. Defendant's disclosure of Plaintiffs' and Class Members' Genetic Testing Information coupled with individually identifying information is highly offensive to the reasonable person.

156. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

157. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

158. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

159. Plaintiffs and Class Members are also entitled to punitive damages resulting from

the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

160. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT IV**
**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois Subclass)***

161. Plaintiffs repeat and reallege the allegations contained in paragraphs 148 through 160 as if fully set forth herein.

162. Providers of genetic testing have a duty to their clients to keep non-public genetic information completely confidential.

163. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

164. Plaintiffs' and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Statement.

165. Contrary to its duties as a genetic testing provider and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Genetic Testing Information and the contents of their communications exchanged with Defendant to third parties.

166. The third-party recipients included, but were not limited to, Google, Facebook and other online marketers.

167. Defendant's disclosures of Plaintiffs' and Class Members' Genetic Testing

Information were made without their knowledge, consent or authorization, and were unprivileged.

168. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

169. As a direct and proximate cause of Defendant's unauthorized disclosures of their personally identifiable, non-public Genetic Testing Information, Plaintiffs and Class Members in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the testee-tester relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

d. Plaintiffs and Class Members did not get the full value of the testing services for which they paid, which included Defendant's duty to maintain confidentiality;

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Genetic Testing Information, and

f. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Genetic Testing Information.

170. Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

## COUNT V
## NEGLIGENCE
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois Subclass)***

171. Plaintiffs repeat and reallege the allegations contained in in paragraphs 161 through 170 as if fully set forth herein.

172. Through using Defendant's Website, Plaintiffs and Class Members provided it with their Genetic Testing Information.

173. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

174. Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Genetic Testing Information from being disclosed to third parties, without their consent, including to Google and Facebook.

175. Defendant further negligently omitted to inform Plaintiffs and the Class that it would use their Genetic Testing Information for marketing purposes, or that their Genetic Testing Information would be transmitted to third parties.

176. Defendant knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Genetic Testing Information to Defendant, had Plaintiffs and the Class known that Defendant intended to use that information for unlawful purposes.

177. Defendant's conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Genetic Testing Information accessed, stored, and disseminated without their knowledge or consent.

178. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

179. Defendant's negligent conduct is ongoing, in that it still holds the Genetic Testing Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all

Class Members.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois Subclass)***

180. Plaintiffs repeat and reallege the allegations contained in paragraphs 171 through 179 as if fully set forth herein.

181. When Plaintiffs and Class Members provided their Genetic Testing Information to Defendant in exchange for its services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Genetic Testing Information without consent.

182. Plaintiffs and Class Members accepted Defendant's offers and provided their Genetic Testing Information to Defendant.

183. Plaintiffs and Class Members would not have entrusted Defendant with their Genetic Testing Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Genetic Testing Information without consent.

184. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Genetic Testing Information to third parties like Google and Facebook.

185. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

186. Plaintiffs and Class Members would not have used Defendant's services or would have paid substantially less for those services, had they known their Genetic Testing Information would be disclosed.

187. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VII**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois Subclass)***

188. Plaintiffs repeat and reallege the allegations contained in paragraphs 180 through 187 as if fully set forth herein.

189. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

190. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Genetic Testing Information to Defendant, which it exchanged for marketing and advertising services, as described, *supra*.

191. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Genetic Testing Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

192. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Genetic Testing Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Genetic Testing Information.

193. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Genetic Testing Information.

194. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, obtained by its surreptitious collection and transmission of their Genetic Testing Information.

195. If Plaintiffs and Class Members knew that Defendant had not reasonably secured

their Genetic Testing Information, they would not have agreed to provide their Genetic Testing Information to Defendant.

196. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

197. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

198. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT VIII**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania Subclass)***

199. Plaintiffs repeat and reallege the allegations contained in paragraphs 180 through 198 as if fully set forth herein.

200. The ECPA protects both sending and receipt of communications.

201. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

202. The transmissions of Plaintiffs' Genetic Testing Information to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

Case 3:24-cv-05050 Document #: 45 Filed: 02/07/25 Page 47 of 52 PageID #:471

203. Electronic Communications. The transmission of Genetic Testing Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

204. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

205. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

206. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

207. By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

208. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Genetic Testing Information to third parties such as Google.

209. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Genetic Testing Information, including the fact that they were the subjects of genetic testing, and the results of that genetic testing.

210. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

211. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

212. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

213. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

214. Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Genetic Testing Information does not qualify for the party exemption.

215. Defendant's acquisition of sensitive communications that were used and disclosed to Google and Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. The Genetic Information Privacy Act, 410 ILCS 513/1, *et. seq*;

b. Invasion of privacy; and

c. Breach of confidence.

216. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed Genetic Testing Information to Google without user authorization.

217. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Genetic Testing Information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Genetic Testing Information

with Google and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Genetic Testing Information, and that Plaintiffs and Class Members did not consent to receive their Genetic Testing Information.

218. As such, Defendant cannot viably claim any exception to ECPA liability.

219. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Genetic Testing Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Genetic Testing Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Genetic Testing Information, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiffs or Class Members;

d. The diminution in value of Plaintiffs' and Class Members' Genetic Testing Information and/or the loss of privacy due to Defendant making such Genetic Testing Information, which Plaintiffs and Class Members intended to remain private, no longer private.

220. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiffs' and Class Members' Genetic Testing Information for financial gain.

221. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

222. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

223. Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

224. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

225. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class and Subclass Members, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class and Illinois Subclass, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Genetic Testing Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

Case 3:24-cv-50510 Document #: 15 Filed: 01/07/25 Page 70 of 112 PageID #:196

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: December 12, 2024

Respectfully submitted,

/s/ Kyle McLean
Kyle McLean
Tyler J. Bean*
Sonjay C. Singh*
David J. DiSabato*
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: kmclean@sirillp.com
E: tbean@sirillp.com
E: ssingh@sirillp.com
E: ddisabato@sirillp.com

*pro hac vice admission anticipated*

***Attorneys for Plaintiff and the Class***

# EXHIBIT

# 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MELISSA NEBLOCK and XODUS MOORE, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENE BY GENE, LTD., d/b/a FAMILYTREEDNA,<br><br>Defendant. | § § § § § § § § § § § § | Case No. 3:24-cv-50501 |

**DECLARATION OF ALEXANDER ZAWISZA**

I, Alexander Zawisza, being over twenty-one (21) years of age and mentally competent, state that I can testify to the following matters based upon my personal knowledge, as follows:

1. I am the Chief Financial and Administration Officer of Gene by Gene Limited d/b/a FamilyTreeDNA ("Family Tree" or "Defendant"). I have served as a financial officer for Family Tree since January of 2023 through the present date.

2. As Chief Financial and Administration Officer, I am knowledgeable regarding the day-to-day operations of Family Tree.

3. Family Tree is a Texas Domestic Limited Partnership with its principal place of business located in Houston, Texas. Family Tree is owned by a Delaware Corporation named My DNA Inc., which also has its principal place of business in Houston, Texas.

4. Family Tree's only office is located in Houston, Texas, and all of the operations and technology for Family Tree, including its servers, which exclusively host and deploy all Family Tree technology, are located in Houston, Texas.

5. The consumer genetic testing division of Family Tree employs approximately twenty-five (25) people. Family Tree has a policy of requiring employees to work from the

office three (3) days a week, so the majority of our employees live in the Houston area. Family Tree is the consumer division of Gene by Gene, Ltd., which has one employee who works remotely from Illinois. He does not work for the Family Tree consumer division, and his job duties are unrelated to marketing and sales.

6. Family Tree has no operations in the State of Illinois, and employees of Family Tree are not required to travel to Illinois to perform their job duties.

7. Family Tree is not registered to do business in the State of Illinois.

8. Family Tree has never solicited business in the State of Illinois.

9. Family Tree has no registered agent for service of process in the State of Illinois.

10. Family Tree does not maintain any bank accounts in the State of Illinois.

11. Family Tree does not employ any sales representatives in the State of Illinois, and Family Tree has never directed its activities at residents of the State of Illinois.

12. Plaintiffs' allegations in Paragraphs 36 and 37 of the Complaint that Family Tree "conducts business" in Illinois, has "advertised and sold" genetic testing kits in Illinois, has committed "tortious acts" in Illinois and/or Family Tree has "established contacts" in Illinois, are inaccurate. Family Tree does not have any advertising specifically designed to generate customers in Illinois. Family Tree does not conduct business in Illinois. To my knowledge, Family Tree and its employees have never committed tortious acts in Illinois. Family Tree has customers in Illinois, but those relationships are only formed after the customers log on to the Family Tree website and register for an account.

13. The Family Tree website and services are available to U.S. residents as well as residents of multiple foreign nations. Accordingly, only a very small percentage of Family

Tree's revenue has been generated by Illinois customers deciding to utilize the Family Tree website.

14. Family Tree revenue derived from Illinois residents from 2018-2023 was less than 3% of the company's total revenue.

15. Family Tree does not send marketing emails specifically designed to generate business in Illinois. Family Tree does not use the U.S. Mail service for the delivery of marketing brochures into Illinois. Family Tree sends emails to existing customers, after the customer takes the initiative of creating a Family Tree account.

16. In Houston, Family Tree operates a genetic testing business whereby consumers have the opportunity to purchase a DNA kit online, collect DNA samples, and then mail the kit to Houston, Texas for analysis of the results.

17. Family Tree operates its own laboratory in Houston, Texas and all testing is conducted in compliance with state and federal law. The genetic testing results of Family Tree customers are protected from a privacy perspective through multiple layers of encryption. There is no evidence that the Family Tree genetic testing results of Neblock or Moore have been disclosed to a third party.

18. The administrative and engineering employees who are potential witnesses in this case are all located in Houston, Texas.

19. All of the documents, data and information related to this case are located in Houston, Texas.

20. Family Tree's policies and operational documents are generated and maintained at the Houston, Texas Office.

21. If the lawsuit filed by plaintiff is litigated in Illinois, any trial testimony will require administrative and technical employees to travel to Illinois, disrupting our day-to-day activities and operations.

22. The litigation and trial of this case in Illinois will create an undue hardship for Family Tree.

*Verification Page to Follow.*

## VERIFICATION PAGE

Under penalties of perjury as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies that aforesaid that he verily believes the same to be true.

***/s/ Alexander Zawisza***

Alexander Zawisza, Chief Financial and Administration Officer
Gene by Gene Ltd, d/b/a Family Tree DNA

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA NEBLOCK and XODUS MOORE, on behalf of themselves and all others similarly situated, | § | |
| Plaintiff, | § | Case No. 3:24-cv-50501 |
| v. | § | |
| GENE BY GENE, LTD., d/b/a FAMILYTREEDNA, | § | |
| Defendant. | § | |

**DECLARATION OF TAT (DANIEL) AU**

I, Tat (Daniel) Au, Chief Information Technology Officer, being over twenty-one (21) years of age and mentally competent, state that I can testify to the following matters based upon my personal knowledge, as follows:

1. I am the Chief Information Technology Officer of Gene by Gene Limited d/b/a FamilyTreeDNA ("Family Tree"). I have served in Family Tree IT leadership positions since May 20, 2023 through the present date.

2. As Chief Information Technology Officer, I am aware of, and knowledgeable regarding the engineering and technology issues described herein. In response to Plaintiffs' Complaint, my engineering team investigated and reviewed data regarding Plaintiffs' utilization of the Family Tree website and genetic matching technology.

3. Plaintiff Melissa Neblock ("Neblock") alleges that she purchased a genetic test kit from Family Tree in December of 2019. Family Tree system records indicate that Neblock interacted with the Family Tree website in 2015, 2017, 2018 and 2019.

4. Plaintiff Xodus Moore ("Moore") alleges that she purchased a genetic test kit from Family Tree in September of 2022. Family Tree has not discovered any records indicating that Moore purchased a genetic test kit from Family Tree in September of 2022, or ever interacted with Family Tree's website, or purchased a kit from Family Tree.

5. Family Tree records indicate that Neblock first utilized the Family Tree website in 2015. She completed a free autosomal DNA transfer, wherein it appears that she uploaded genetic information to the Family Tree website from a competitor of Family Tree. The records indicate that Neblock did not purchase a kit using the 2015 account.

6. Family Tree records indicate that Neblock created a second Family Tree account on February 10, 2017, and she ordered genetic testing for what appears to be a male individual.

7. Attached hereto as **Exhibit 3A** is a true and correct copy of Neblock's 2017 account information with Family Tree.

8. Prior to gaining access to the Family Tree website to create the 2017 account, Neblock was required to agree to certain terms of service (TOS) in 2017. Attached hereto as **Exhibit 3B** is a copy of the 2017 TOS agreed to by Neblock.

9. In 2017, Neblock would have had to click on a box that stated "I agree", which notified Neblock that by clicking on the icon she agreed to the Family Tree 2017 TOS. Attached hereto as **Exhibit 3C** is screenshot of what was presented to Plaintiff when she agreed to the TOS and created her 2017 account with Family Tree.

10. On April 11, 2024, Family Tree sent an email to Plaintiffs and all users of the Family Tree website notifying them that the Terms of Service have been amended. Attached hereto as **Group Exhibit 3D** is a true and correct copy of the April 11, 2024 email, and a copy of the 2024 Terms of Service ("2024 TOS") referenced in the April of 2024 notification email.

11. The genetic testing results of Family Tree customers are protected by multiple layers of encryption. There is no evidence that Plaintiffs' Family Tree testing results were disclosed to any third parties.

*Verification Page to Follow.*

# VERIFICATION PAGE

Under penalties of perjury as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies that aforesaid that he verily believes the same to be true.

Signed by:
Daniel Au
046A060A13F0455...

Tat (Daniel) Au, Chief Information Technology Officer, Gene by Gene Ltd, d/b/a Family Tree DNA

# EXHIBIT 3A

Family Tree DNA FTDNA Admin BCG Admin Logout buddyt

Home Search Upgrade Kit

Edit Contact Info

| | | | |
|---|---|---|---|
| Kit Number: | [redacted] | Address 1: | c/o Melissa Neblock |
| Prefix: | | Address 2: | 414 Preserve Dr |
| First Name: | Sam Sofokles Melissa | City: | Genoa |
| Middle Name: | | State: | Illinois |
| Last Name: | Mavrilidakis Neblock | Postal Code: | 60135 |
| Birth Surname: | Neblock | Country: | United States |
| Suffix: | | | |
| Phone: | 8154038112 | Primary Email: | [redacted]@hotmail.com |
| FAX: | | DNA Provider Deceased: | |

| | | | |
|---|---|---|---|
| Request C/D Kit | GRC Generate | Update Ancestry Info | Re-cache FF Matches |
| Toggle Match Consent | GRC Upload | Join/Remove Project | Delete FF Matches |
| Toggle DNA Processing | Increase GRC Priority | Download ADNA Rpt | Re-subscribe email |
| Toggle Gender | Decrease GRC Priority | Reset Password | Unlock Kit |
| Toggle Kit Received | Reset Y Haplogroup | Change Password | DNA Provider Deceased |
| Clear Y-DNA Cache | Reset BAM Generation | Toggle LE | Clear MH Connection |
| Clear mtDNA Cache | Set mtDNA Ashkenazi | Display As Research | |
| | Set YDNA Ashkenazi | Delete Kit | |

Submit Bug Report Submit Refund Request Submit Lab St

Submit C/D Kit Request Move Payment Data Removal

Autosomal Transfer/FF Bug Report Create Help

User Notes System Notes Audits Shipments

Add Note

| TicketNo | Date | CreatedBy | Note | |
|---|---|---|---|---|
| 00ADE39B | 5-09-2017 3:07 PM | RICHARDC | C/D kit requested | Hide |

**Project**

Greece
E-M35
Crete a Civiliza
Greek I

Account Info Products Payments Provisioning Pending Lab Results YDNA Big Y Family Finder Notifications Surveys Historical Contact Info Beneficiary Info Kit Manag

Product Summary Invoices

**Invoice: 1753699**

Sale Date: 2/10/2017 5:09:04 PM
Amount: $181.95
Coupon Code:
Balance: $0.00
Paid:
Cancelled:
Sale Agent: SYSTEM
Queue Based Order Processing Message:
Id:
Created:
Completed:
Json Message:

Billing Info:
Sam Sofokles Melissa Mavrilidakis Neblock
414 Preserve Dr
Genoa, Illinois 60135
United States
[redacted]@hotmail.com

**Payments**

| | |
|---|---|
| Payment Number: | Credit Card |
| Payment Number: | [redacted] |
| Payment Date: | 2/10/2017 5:09:00 PM |
| Payment Amount: | $181.95 |

Cancel Invoice

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled |
|---|---|---|---|---|---|---|
| Y-DNA37 | | $169.00 | | 726 | 0 | |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **PP3** | | | 7/7/2017 6:20:52 PM | Toggle State Remove |
| **PP5** | | | 7/7/2017 6:20:52 PM | Toggle State Remove |
| **STR** | | | 7/7/2017 6:20:52 PM | Toggle State Remove |
| **Prediction** | | | 7/7/2017 6:21:02 PM | Toggle State Remove |
| **YSTRFAS1** | | | 7/7/2017 6:21:02 PM | Toggle State Remove |
| **YSTRFAS2** | | | 7/7/2017 6:21:02 PM | Toggle State Remove |

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled | |
|---|---|---|---|---|---|---|---|
| | | | | | | | Lab Proc: **YSTRNGS**; Results Back: ☑; Results Posted: ☑; Completed Date: 7/7/2017 6:21:02 PM; Toggle State; Remove; Cancel Product; Create LabProcs; Increase GRC Priority; Decrease GRC Priority |
| Domestic Shipping | | $12.95 | ☑ | 726 | 0 | ☐ | Lab Proc: **DNA Extraction**; Results Back: ☑; Results Posted: ☑; Completed Date: ; Toggle State; Remove; Cancel Product; Create LabProcs; Increase GRC Priority; Decrease GRC Priority |

**Invoice: 1790450**

Sale Date: 2/28/2017 6:29:56 PM

Amount: $0.00

Coupon Code:

Balance: $0.00

Paid: ☑

Cancelled: ☐

Sale Agent: SYSTEM

Queue Based Order Processing Message:

Id:

Created:

Completed:

Json Message:

Cancel Invoice

Billing Info: Sam Brown
[redacted]@hotmail.com

**Payments**

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled | |
|---|---|---|---|---|---|---|---|
| Free Autosomal DNA Transfer | | $0.00 | ☑ | 0 | | ☐ | See lab procs below |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **FreeTransferAncestry** | ☑ | ☐ | | Toggle State / Remove |
| **AncestryDNAChip** | ☑ | ☑ | 1/24/2019 8:30:54 AM | Toggle State / Remove |
| **FreeTransfer** | ☑ | ☑ | 1/24/2019 8:30:54 AM | Toggle State / Remove |

Cancel Product | Create LabProcs | Increase GRC Priority | Decrease GRC Priority

**Invoice: 2695069**

Sale Date: 11/14/2018 6:49:08 PM

Amount: $148.00

Coupon Code:

Balance: $0.00

Paid: ☑

Cancelled: ☐

Sale Agent: SYSTEM

Queue Based Order Processing Message:

Id: 3523d8fa-9bb9-467d-b0de-081d312e213c

Created: 11/14/2018 6:49:01 PM

Completed: 11/14/2018 6:49:09 PM

Billing Info:
Sam Sofokles Mavrilidakis
c/o Melissa Neblock
414 Preserve Dr
Genoa, IL 60135
United States
[redacted]8112
[redacted]@hotmail.com

**Payments**

| | |
|---|---|
| Payment Number: | Credit Card |
| Payment Number: | [redacted] |
| Payment Date: | 11/14/2018 6:49:00 PM |
| Payment Amount: | $148.00 |

Json Message: {"orderInfo":{"id":"3523d8fa-9bb9-467d-b0de-081d312e213c","confirmationNumber":"312e213c","saleAgent":"SYSTEM","amount":148.00,"ordered":"2018-11-14T18:49:01.2012705-06:00","couponId":"","project":null,"projectFunds":null,"resellerId":null,"billMeLater":false,"billingAddress":{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"shippingAddress":{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"paymentInformation":[{"paymentId":"AM0A0FDB0A11"}],"orderKits":[{"kitNum":"644493","isFemale":false,"customNumber":null,"products":[{"productId":1670,"price":148.0000,"name":"Y-DNA111","offerId":1126,"categoryId":2,"category":"Y-DNA"}]}]},"previousWorkersResults":null,"overrides":null,"retries":0}

Cancel Invoice

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled |
|---|---|---|---|---|---|---|
| Y-DNA111 | Y37 to Y111 | $148.00 | ☑ | 916 | 0 | ☐ |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **MP10** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP11** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP12** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP13** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP6** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP7** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP8** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |
| **MP9** | ☑ | ☑ | 12/7/2018 12:50:06 AM | Toggle State Remove |

Cancel Product | Create LabProcs | Increase GRC Priority | Decrease GRC Priority

**Invoice: 2701331**

Sale Date: 11/16/2018 10:23:42 PM
Amount: $119.00
Coupon Code:
Balance: $0.00
Paid: ☑
Cancelled: ☐
Sale Agent: SYSTEM
Queue Based Order Processing Message:
Id: 9cbe4d7d-f2e6-4400-8efd-e7249667c5cb
Created: 11/16/2018 10:23:39 PM
Completed: 11/16/2018 10:23:43 PM

Billing Info:
Sam Sofokles Mavrilidakis
c/o Melissa Neblock
414 Preserve Dr
Genoa, IL 60135
United States
[redacted]38112
[redacted]@hotmail.com

**Payments**

Payment Number: Credit Card
Payment Number: [redacted]
Payment Date: 11/16/2018 10:24:00 PM
Payment Amount: $119.00

Json Message: {"orderInfo":{"id":"9cbe4d7d-f2e6-4400-8efd-e7249667c5cb","confirmationNumber":"9667c5cb","saleAgent":"SYSTEM","amount":119.00,"ordered":"2018-11-16T22:23:39.2160193-06:00","couponId":"","project":null,"projectFunds":null,"resellerId":null,"billMeLater":false,"billingAddress":{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"shippingAddress":{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"paymentInformation":[{"paymentId":"AM0A0FE603A2"}],"orderKits":[{"kitNum":"644493","isFemale":false,"customNumber":null,"products":[{"productId":78099,"price":119.0000,"name":"E - V13 SNP Pack","offerId":null,"categoryId":18,"category":"Sequenome"}]}]},"previousWorkersResults":null,"overrides":null,"retries":0}

Cancel Invoice

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled |
|---|---|---|---|---|---|---|
| E - V13 SNP Pack | | $119.00 | ☑ | 916 | 0 | ☐ |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **SMS-V13** | ☑ | ☑ | 1/11/2019 12:56:54 PM | Toggle State Remove |

Cancel Product | Create LabProcs | Increase GRC Priority | Decrease GRC Priority

**Invoice: 2855405**

Sale Date: 3/10/2019 7:26:58 PM
Amount: $19.00
Coupon Code:
Balance: $0.00
Paid: ☑
Cancelled: ☐
Sale Agent: SYSTEM
Queue Based Order Processing Message:
Id: fab1e394-c2bc-4cd8-bdaf-9e9e78897779
Created: 3/10/2019 7:26:53 PM
Completed: 3/10/2019 7:26:58 PM

Billing Info:
Melissa Neblock
414 Preserve Dr
414 Preserve Dr
Genoa, IL 60135-1453
United States
[redacted]@hotmail.com

**Payments**

| | |
|---|---|
| Payment Number: | Credit Card |
| Payment Number: | [redacted] |
| Payment Date: | 3/10/2019 7:27:00 PM |
| Payment Amount: | $19.00 |

Json Message:
{"orderInfo":{"id":"fab1e394-c2bc-4cd8-bdaf-
9e9e78897779","confirmationNumber":"78897779","saleAgent":"SYSTEM","amount":19.00,"ordered":"2019-03-
10T19:26:53.7661733-
05:00","couponId":"","project":null,"projectFunds":null,"resellerId":null,"billMeLater":false,"billingAddress":
{"firstName":"Melissa","middleName":"","lastName":"Neblock","address":"414 Preserve Dr","address2":"414
Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135-
1453","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"shippingAddress":
{"firstName":"Melissa","middleName":"","lastName":"Neblock","address":"414 Preserve Dr","address2":"414
Preserve Dr","city":"Genoa","state":"IL","country":"United States","postalCode":"60135-
1453","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"paymentInformation":
[{"paymentId":"AC0A1BFF9370"}],"orderKits":[{"kitNum":"644493","isFemale":false,"customNumber":null,"products":
[{"productId":1,"price":19.0000,"name":"Autosomal Transfer
Unlock","offerId":null,"categoryId":1,"category":"Family
Finder"}]}],"needsBasicPackaging":null},"previousWorkersResults":null,"overrides":null,"retries":0}

Cancel Invoice

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled |
|---|---|---|---|---|---|---|
| Autosomal Transfer Unlock | | $19.00 | ☑ | 948 | 0 | ☐ |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **PopulationFinder** | ☑ | ☑ | 3/10/2019 7:26:58 PM | Toggle State Remove |
| **AncientOrigins** | ☑ | ☑ | 3/10/2019 7:26:58 PM | Toggle State Remove |
| **ChromosomeBrowser** | ☑ | ☑ | 3/10/2019 7:26:58 PM | Toggle State Remove |

Cancel Product | Create LabProcs | Increase GRC Priority | Decrease GRC Priority

**Invoice: 3127654**

Sale Date: 12/27/2019 11:25:28 PM
Amount: $229.00
Coupon Code:
Balance: $0.00
Paid: ☑
Cancelled: ☐
Sale Agent: SYSTEM
Queue Based Order Processing Message:
Id: 1aff1b0a-34f8-48be-bb35-27ddd2f6f395
Created: 12/27/2019 11:25:23 PM
Completed: 12/27/2019 11:25:28 PM

Billing Info:
Sam Sofokles Mavrilidakis
c/o Melissa Neblock
414 Preserve Dr
Genoa, IL 60135
United States
[redacted]8112
[redacted]@hotmail.com

**Payments**

| | |
|---|---|
| Payment Number: | Credit Card |
| Payment Number: | [redacted] |
| Payment Date: | 12/27/2019 11:25:00 PM |
| Payment Amount: | $229.00 |

Json Message:
{"orderInfo":{"id":"1aff1b0a-34f8-48be-bb35-
27ddd2f6f395","confirmationNumber":"d2f6f395","saleAgent":"SYSTEM","amount":229.00,"ordered":"2019-12-
27T23:25:23.4480923-
06:00","couponId":"","project":null,"projectFunds":null,"resellerId":null,"billMeLater":false,"billingAddress":
{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa
Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United
States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"shippingAddress":
{"firstName":"Sam Sofokles","middleName":"","lastName":"Mavrilidakis","address":"c/o Melissa
Neblock","address2":"414 Preserve Dr","city":"Genoa","state":"IL","country":"United
States","postalCode":"60135","emailAddress":"78koukla@hotmail.com","phone":"8154038112"},"paymentInformation":
[{"paymentId":"AI0A8F8F0026"}],"orderKits":[{"kitNum":"644493","isFemale":false,"customNumber":null,"products":
[{"productId":30006,"price":229.0000,"name":"Big Y-700","offerId":1299,"categoryId":2,"category":"Y-
DNA"}]}],"needsBasicPackaging":null},"previousWorkersResults":null,"overrides":null,"retries":0}

Cancel Invoice

**Kits**

Kitnum: [redacted]

| Product Name | Offer Name | Price | Paid | Batch | Priority | Cancelled | |
|---|---|---|---|---|---|---|---|
| Big Y-700 | Y111 to Big Y 700 upgrade | $229.00 | ☑ | 1044 | 0 | ☐ | (see lab procedures below) |

| Lab Proc | Results Back | Results Posted | Completed Date | |
|---|---|---|---|---|
| **Y700** | ☑ | ☑ | 2/21/2020 9:59:03 AM | Toggle State Remove |
| **NvY700Tw6** | ☑ | ☑ | 2/21/2020 9:59:03 AM | Toggle State Remove |

Cancel Product | Create LabProcs | Increase GRC Priority | Decrease GRC Priority

# EXHIBIT

# 3B

# Legal Issues - Privacy Policy, Terms of Service and Refunds

Family Tree DNA follows stringent policies for protecting your privacy according to state legislation guidelines. We control the Surname Database Library and genetic testing scores. Family Tree DNA only shares limited information with testing facilities. Family Tree DNA and our Genomics Research Center follow strict guidelines to ensure your privacy.

PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION. THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.

This Agreement includes the acceptable use of the FamilyTreeDNA Website and its contents, and your rights, obligations and restrictions regarding your use. Please see below for more information about how we collect, use, and share information on the Website. Family Tree DNA may modify this Agreement at any time and such modification shall be effective upon posting on the Family Tree DNA Website. You agree to be bound to any changes to this Agreement when you use the Family Tree DNA Web site after any such modification is posted. It is therefore important that you review this Agreement regularly to ensure you are updated as to any changes. Your continued use of the Family Tree Website after any such change constitutes your acceptance of the new Terms of Use. If you do not agree to any of these terms or any future Terms of Use, do not use or access (or continue to access) the Family Tree DNA Website.

In addition to the PRIVACY AND CONFIDENTIALITY STATEMENT below, Family Tree DNA also adheres to the Genetic Genealogy Guidelines (https://web.archive.org/web/20170126051223/http://www.geneticgenealogystandards.com/) as proposed by the The Genetic Genealogy Standards Committee in January 2015.

In addition to the PRIVACY AND CONFIDENTIALITY STATEMENT below, Family Tree DNA also adheres to the following SAFE HARBOR PRIVACY STATEMENT (/web/20170126051223/https://www.familytreedna.com/pdf-docs/FTDNA-Safe-Harbor-Standards-07-2012.pdf) in connection with the transfer and protection of "personal information" received from the European Union (EU) or Switzerland.

Family Tree DNA complies with the U.S.-EU Safe Harbor Framework and the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of personal information from European Union member countries and Switzerland. Family Tree DNA has certified that it adheres to the Safe Harbor Privacy Principles of notice, choice, onward transfer, security, data integrity, access, and enforcement. To learn more about the Safe Harbor program, and to view Family Tree DNA's certification, please visit http://www.export.gov/safeharbor/ (https://web.archive.org/web/20170126051223/http://www.export.gov/safeharbor/)

In compliance with the US-EU and US-Swiss Safe Harbor Principles, Family Tree DNA commits to resolve complaints about your privacy and our collection or use of your personal information. European Union or Swiss citizens with inquiries or complaints regarding this privacy policy should first contact Family Tree DNA by submitting an inquiry at our Contact Us (/web/20170126051223/https://www.familytreedna.com/contact.aspx#contactForm) form, with the word SAFEHARBOR in the subject line. Any correspondence without SAFEHARBOR in the subject line will not receive a response.

Family Tree DNA has further committed to refer unresolved privacy complaints under the US-EU and US-Swiss Safe Harbor Principles to an independent dispute resolution mechanism, the BBB EU SAFE HARBOR, operated by the Council of Better Business Bureaus. If you do not receive timely



(/web/20170126051223/https://www.familytreedna.co

## Project Search

Equals

Search Tips SEARCH

## About DNA For Genealogy



**Watch** Family Tree DNA President & CEO Bennett Greenspan discuss DNA testing for Genetic Genealogy.

**Watch more videos here. (/web/20170126051223/https://www.familytreedna.com/video.aspx)**



**(/web/20170126051223/https://www.familytr instructions.aspx)**

## View Our Test Kit

**View (/web/20170126051223/https://www.familytreedna.com/ instructions.aspx)** the Family Tree DNA test kit consisting of two cheek scrapers and two collection tubes... **Instructions (/web/20170126051223/https://www.familytreedna.com/ instructions.aspx)**

## Genetic Genealogy Tutorials

Learn To Use DNA For Your Genealogy (/web/20170126051223/https://www.familytreedna.c

Glossary Of Terms (/web/20170126051223/https://www.familytreedna.c

Books and Videos (/web/20170126051223/https://www.familytreedna.c and-videos.aspx)

Scientific Papers (/web/20170126051223/https://www.familytreedna.c papers.aspx)

## FTDNA Community

Join Our Question And Answer Forum (/web/20170126051223/https://www.familytreedna.c

acknowledgment of your complaint, or if your complaint is not satisfactorily addressed by Family Tree DNA, please visit the BBB EU SAFE HARBOR web site at www.bbb.org/us/safe-harbor-complaints (https://web.archive.org/web/20170126051223/http://www.bbb.org/us/safe-harbor-complaints) for more information and to file a complaint.

Purchase FTDNA Branded Merchandise (https://web.archive.org/web/20170126051223/http:

Family Tree DNA accepts the responsibility to keep your specific data private, at the same time, making enough general information public to allow us to build a Surname Database library usable for genealogical purposes.

### To accomplish this Family Tree DNA allows you to do the following:

You may search the existing Surname Database Library to see if the surname you are searching is already there. If it is, you may order your DNA test kit and return to search to see that the database has increased under your surname. If the name you want to search is not there, you may order your test kit and then return to the database to see your surname registered.

## Privacy and Confidentiality Statement

Family Tree DNA maintains strict privacy and confidentiality.

Your unique test kit number will accompany your collection tube to the testing lab. The computer-generated number and your surname are the only information about you that the testing facility will see. Once the lab completes your DNA test, Family Tree DNA enters the test results in a secure database. We then perform a comparison between your specific genetic results and those of others in the database.

If the matching program finds a genetic match between you and another person in the database, and you have each signed the release form (/web/20170126051223/https://www.familytreedna.com/forms/FTDNA-release-form.pdf) Family Tree DNA will notify you via email.

If a genetic match is found between you and another individual who enters the library at some time in the future, both will be given the information that a potential match is in the database provided that BOTH of you have signed the release form (/web/20170126051223/https://www.familytreedna.com/forms/FTDNA-release-form.pdf). Only where both parties have signed the release form will we release contact information concerning the separate parties to the other party. In this way, all persons in the database will have the right to decide if they want to contact their genetic match(es).

For users that signed the release form (/web/20170126051223/https://www.familytreedna.com/forms/FTDNA-release-form.pdf), Family Tree DNA may show your ethnicity breakdown to your genetic matches. However, you can opt-out of sharing your ethnicity and keep your results private with only you and the administrators of projects to which you belong by modifying your privacy settings here (/web/20170126051223/https://www.familytreedna.com/my/privacy-sharing.aspx).

Please read the Settings – Privacy & Sharing Page (https://web.archive.org/web/20170126051223/https://www.familytreedna.com/learn/user-guide/my-account/account-privacy-sharing-page/) on our Learning Center for more information regarding your privacy settings and permissions.

## Your Commitment to Privacy

You agree that your Kit number and Password are not to be disclosed publicly, as this disclosure may lead to others having access to names and emails of your matches, thus violating the privacy of other customers. If Family Tree DNA becomes aware that a customer's kit number and password has been disclosed in any way to the public, it reserves the right of changing the password.

## 3rd Party Payments and Account Access

If a person consents to testing that is paid for by another party, that person is consenting to allow that individual or group project access to their results and information, even if they order and pay for additional testing later. The purchaser of a test cannot deny access to the account and raw results of

the test taker.

Should the test taker no longer want to allow the purchasing individual or group to have access their account, the test taker may reimburse the purchasing individual or group the full amount of the purchase price and return sole access of that account to test taker only. Once the test taker has provided documentation to Family Tree DNA that they have provided a full reimbursement of the purchase to the original payor, we will be able to return access to test taker alone. Please note that although a test taker may reclaim ownership of the record and DNA stored with Family Tree DNA, they cannot undo any prior data downloads or sharing outside of Family Tree DNA.

## Beneficiary Information

The owner of an account is responsible for naming a beneficiary to that account, should the test taker pass away. If no beneficiary is named on the account, Family Tree DNA retains ownership of the record and DNA.

## Project Participation

Family Tree DNA provides the option to participate in one or more projects. This may help you learn more by working with others who may share similar ancestry. If you choose to participate in a project, the Project Administrator will be able to view your results and contact information so that he or she may best help members of the project learn about their ancestry.

You can view a list of projects here (/web/20170126051223/https://www.familytreedna.com/projects.aspx).

While FTDNA has strict Project Administrator guidelines that requires administrators to abide by our Group Administrator Guidelines for FTDNA Projects (https://web.archive.org/web/20170126051223/https://www.familytreedna.com/learn/project-administration/gap-guidelines-ftdna-projects/), Family Tree DNA is not responsible for anything that the individual administrator does that is against those guidelines, other than admonishing or removing a group administrator from his or her role, if he or she is found to have breached or infringed on those guidelines.

Projects often have a public website displaying member results, so that members can share information more easily. Most groups will also have a member list that is available to members of the project, and includes name, email address, and haplogroups. You may opt out of this list by choosing the appropriate setting in your Privacy Settings. The free website that Family Tree DNA provides to projects may list member results by kit number. Results tables and maps on the free public website may include a participant's oldest known ancestor, the ancestor's country of origin, surname, and full name. Note that any changes you make to your permissions or privacy settings can experience a delay when updating on such public pages. You may wish to discuss what information will be available on the project's website before joining a project.

You may join or leave projects at any time at no charge. Please note that any information or data downloaded by a group administrator for analysis cannot be retrieved and the Project Administrator may still have access to your downloaded results even after you have left a project.

It is important to note that while Family Tree DNA does not impose a limit to the number of projects one can join, we will not tolerate customers joining multiple projects with the purpose of data mining or finding information that is not relevant to one's personal ancestral origins. Family Tree DNA reserves the right to remove people from projects at our sole discretion or if it feels that a participant is abusing the system in a way that may infringe another participant's privacy.

The mtDNA full sequence test contains some genes in the coding region (CR). By default, these results are unavailable to the project administrators. You may choose to allow your Project Administrators to view your coding region results on the My Account – Results Display Settings page of your myFTDNA Account (personal page).

A "Relevant Match" as stated in the release form (/web/20170126051223/https://www.familytreedna.com/forms/FTDNA-release-form.pdf) is one of the following:

RELEVANT MATCHES

| Test | Genetic Distance of Relevant Matches |
|---|---|
| **Y-DNA 12** | Exact Matches and (within a project) a genetic distance of 1 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/y-dna-myftdna/y-matches-page/) |
| **Y-DNA 25** | 0 through 2 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/y-dna-myftdna/y-matches-page/) |
| **Y-DNA 37** | 0 through 4 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/y-dna-myftdna/y-matches-page/) |
| **Y-DNA 67** | 0 through 7 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/y-dna-myftdna/y-matches-page/) |
| **Y-DNA 111** | 0 through 10 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/y-dna-myftdna/y-matches-page/) |
| **mtDNA** | Exact Matches (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/mtdna-myftdna/mt-matches-page/) |
| **mtDNAPlus (HVR1 & HVR2)** | Exact Matches excluding positions 309 and 315 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/mtdna-myftdna/mt-matches-page/) |
| **mtFull Sequence (HVR1, HVR2 & Coding Region)** | 0 through 3 including heteroplasmy, but excluding positions 309 and 315 (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/mtdna-myftdna/mt-matches-page/) |
| **Family Finder** | Persons sharing a certain amount of centimorgans, and listed under Family Finder matches (/web/20170126051223/https://www.familytreedna.com/learn/user-guide/mtdna-myftdna/mt-matches-page/) |

** Note: When a Y-Chromosome STR marker comparison differs by more than one, the matching program takes genetic distance rather than the number of mismatching markers into consideration. This is because for most STR markers, each step difference is as meaningful as mismatches on additional markers.

## User Submitted Content

You retain ownership in Personal Information and content such as photos, videos, posts, and comments submitted by you (collectively, "User Submitted Content") to Family Tree DNA and its websites. You hereby grant Family Tree DNA a world-wide, transferable, royalty-free, irrevocable, and perpetual license to host, display, sub-license, distribute, recreate, modify, or use such User Submitted Content in any form, to any extent, or within any context Family Tree DNA deems necessary to promote, modify, or develop its services. This license continues even if you stop using Family Tree DNA's services.

Family Tree DNA maintains the right, in its sole discretion, to remove, edit, block, or refuse any User Submitted Content and disable access thereto for any reason, including without limitation that such User Generated Content violates the Terms of Service or is otherwise objectionable.

All User Submitted Content provided to Family Tree DNA and its websites is the sole responsibility of the person who submitted it. This means that you are entirely responsible for all User Submitted Content that you provide.

## Privacy Document – Gene by Gene, Ltd.

Gene by Gene, Ltd ("Gene by Gene") is in the business of providing DNA tests for genealogy, ancestry, medical, research and paternity.

Gene by Gene owns and runs its own lab, the Genomics Research Center in Houston, TX.

In addition, Gene by Gene owns and operates the websites GenebyGene.com, DNATraits.com, FamilyTreeDNA.com, DNAFindings.com and DNADTC.com ("Gene by Gene websites").

## Purposes of this Document

This document is intended to explain how Gene by Gene manages the privacy of your personal data and other information that can be used to identify you, either alone or in combination with other information, including your DNA samples and test results (collectively, “Personal Information”).

We use your Personal Information to provide you with Gene by Gene services, customized reports and features. Customers of the different services provided by Gene by Gene are offered an opportunity to sign a Consent Form specific to each service which allows them to take full advantage of the services. In the absence of a specific Consent Form, this Privacy Document will prevail.

By using the Gene by Gene websites and the services offered, you consent to the collection, use, storage and disclosure of your Personal Information by Gene by Gene in accordance with this Privacy Document. It should be read in conjunction with the Gene by Gene Terms of Use and Gene by Gene Consent Agreement.

## Our Commitment to You

Gene by Gene collects, processes, stores and shares your Personal Information in a responsible, transparent and secure environment that fosters our customers’ trust and confidence. To that end, Gene by Gene respects your privacy and will not sell or rent your Personal Information without your consent.

Please read this Gene by Gene Privacy Document and the relevant website FAQs or corresponding section for additional details.

## Storage and Processing

When you provide us with any Personal Information, that Personal Information will be stored and processed at the Company’s Genomics Research Center in Houston, Texas. In the event that you are located outside the USA and still choose to order a DNA Test kit and provide a DNA sample, by providing us with Personal Information, you specifically consent to the transfer, storage and processing of Personal Information to and in the United States, which you recognize may provide a different level of protection for Personal Information and personal data than in your country of residence.

## Security

Gene by Gene places great importance on the security of all of our customers’ User Submitted Content. We have reasonable and adequate security measures in place to attempt to protect against the loss, misuse, or alteration of customer data under our control.

For example, our security and privacy practices are periodically reviewed and enhanced as necessary and only authorized personnel have access to Personal Information. We use secure server software to encrypt financial information you input before it is sent to us and we only work with laboratories and third parties who have met and commit to our security standard. While we cannot guarantee that loss, misuse or alteration of data will not occur, we use commercially reasonable efforts to prevent this.

You submit to the following when using any Gene by Gene service, including Family Tree DNA and its other websites.

1. You will not collect users’ contact information, genetic data, or any other content on the site through manual or automated means (such as harvesting bots, robots, spiders, or scrapers) without the prior explicit permission of Gene by Gene
2. You will not post content that is protected by copyright or trademark or that does not belong to you and you do not have authorization to use from the owner of the copyright or trademark
3. You will not post photos of living individuals (other than you or your minor children) without their consent
4. You will not post content that is proprietary or confidential
5. You will not post unauthorized commercial communication (spam)
6. You will not engage in unlawful marketing on Gene by Gene websites, such as pyramid schemes

7. You will not upload viruses or other malicious code
8. You will not bully, harass, or intimidate other users
9. You will not post content that is hate speech, threatening, pornographic, incites violence, or contains nudity or graphic violence
10. You will follow all applicable laws if you publicize or offer contests, giveaways, or sweepstakes on Gene by Gene websites
11. You will not use Gene by Gene or its services to do anything unlawful, misleading, malicious, or discriminatory
12. You will not do anything that could disable, overburden, or impair the proper working or appearance of Gene by Gene or its websites, such as denial of service attacks or interference with page rendering or other functionality
13. You will not encourage or aid other users in violating these terms
14. You will not post links to 3rd party websites with content that violates these terms

## Use and Disclosure of Personal Information

When you order an individual test online we primarily use your Personal Information to provide your test results, to verify and carry out financial transactions relating to payments you make online and to communicate with you.

Gene by Gene discloses your Personal Information to third parties in very limited circumstances as set out below.

a. To third party service providers, under the protection of appropriate agreements, so that the third parties may perform various tasks for us. For example, we use third parties to process payments from you. These third parties are only given access to that information needed to perform their services, and are prohibited from using it for other purposes. Processors may include affiliated and unaffiliated service providers in the United States, Europe and in other jurisdictions.
b. To the different Gene by Gene divisions, so that they may use Personal Information for the purposes described in this Privacy Document. Additionally, we might restructure, buy, or sell business units. In these transactions, customer information is often one of the transferred assets, remaining subject to promises made in then prevailing Privacy Documents. Also, in the event that Gene by Gene, or substantially all of its assets or stock, are acquired, transferred, disposed of (in whole or part and including in connection with any bankruptcy or similar proceedings), Personal Information including test results will as a matter of course be one of the transferred assets.
c. We may disclose your Personal Information
    i. with your knowledge and any relevant permissions
    ii. as described in this Privacy Document
    iii. as may be required by law, regulatory authorities, legal process or to protect the rights or property of Gene by Gene or other Users (including outside your country of residence)
    iv. to enforce our terms and conditions
    v. to protect our rights, privacy, safety, confidentiality, reputation or property, and/or that of Gene by Gene, you or others
    vi. to prevent fraud or cybercrime
    vii. to permit us to pursue available remedies or limit the damages that we may sustain.

## Liability Disclaimer

ALL USER SUBMITTED CONTENT SHARED WITH OR THROUGH GENE BY GENE AND ITS SERVICES, INCLUDING FAMILY TREE DNA AND ITS OTHER WEBSITES, ARE SUBJECT TO THE TERMS AND CONDITIONS OF GENE BY GENE AND ITS WEBSITES. GENE BY GENE AND ITS SERVICES DO NOT ENDORSE OR ACCEPT RESPONSIBILITY OR LIABILITY FOR ANY USER SUBMITTED CONTENT. ALL USER SUBMITTED CONTENT PROVIDED TO GENE BY GENE OR ITS WEBSITES IS THE SOLE RESPONSIBILITY OF THE PERSON WHO SUBMITTED IT. USERS MAY SUBMIT LINKS TO 3RD PARTY WEBSITES. GENE BY GENE AND ITS SERVICES DO NOT ENDORSE OR ACCEPT RESPONSIBILITY OR LIABILITY FOR CONTENT, PRODUCTS, OR SERVICES AVAILABLE FROM THOSE SITES AND VIA THOSE LINKS.

WHERE PERMITTED BY LAW, GENE BY GENE AND ITS SERVICES WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUE, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES.

TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GENE BY GENE AND ITS SERVICES FOR ANY CLAIMS UNDER THESE TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS LIMITED TO THE AMOUNT YOU PAID TO USE THE SERVICES.

IN ALL CASES, GENE BY GENE AND ITS SERVICES WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE, KNOWN OR UNKNOWN.

## Non-Personal Information

When you visit our Gene by Gene websites, we may automatically collect non-personal information about you, such as the website from which you have come to our Gene by Gene websites, your Media Access Control address, your computer type, screen resolution, Operating System version and Internet browser. We may also collect non-personal information such as demographic data, for example your geographic area. Non-personal information also includes personal information that has been aggregated in a manner such that the end-product does not personally identify you or any other user of the Gene by Gene websites.

## Additional Consent

Your use of any of Gene by Gene's services constitutes your consent to Gene by Gene allowing us to use your Personal Information for purposes of quality control and internal research and development activities.

Additionally, your consent will be sought for research purposes. Much of the genetic information resulting from DNA testing has not been clinically validated, and the technology we use, which is the same technology used by the research community, to date has not been widely used for clinical testing. For these reasons, our customers are encouraged to participate in Gene by Gene's research initiatives that may contribute to a better understanding of the results of genetic testing. Your participation in these initiatives is entirely voluntary and your DNA test results will not be used or disclosed without your consent. Once given, however, consent cannot be revoked.

We will ask for your consent in several ways. For example:

1. A general consent document will be offered to you as part of your decision to participate in any of the Gene by Gene services offered by any of the websites owned and operated by Gene by Gene. Your consent will allow Gene By Gene to share your test results, anonymized and aggregated with those of others who have consented, with our third-party research partners for the purposes of general scientific research intended to lead to publication in peer-reviewed scientific journals.
2. From time to time, we may ask for explicit consent to participate in specific research, and upon this consent we may allow our research partners to access your individual test results, which will be kept anonymous, for the purposes of general scientific research intended to lead to publication in a peer-reviewed scientific journal.
3. From time to time, we may ask for explicit consent to participate in specific research, and upon this consent we may allow our research partners to access your individual test results, which will be kept anonymous, for the purposes of scientific research aimed at advancing genetic knowledge and creating, commercializing, or undertaking activities toward the practical applications that may lead to the improvement of health care.
4. From time to time, we may ask for explicit consent to allow our research partners to access your non-anonymized individual test results in connection with a specific research project.

Research partners may include commercial or non-profit organizations that conduct or support population genetic studies, scientific/medical research, or the development of drugs or devices to diagnose, predict, or treat health conditions.

## Changes

Gene by Gene may make changes to this Privacy Document from time to time. If we do so, we will issue an updated version of this Privacy Document with an updated date on the Gene by Gene Website (and/or notify you via email or by other appropriate means) so that you will be aware of what information we collect, how we use it and under what circumstances we disclose it in accordance with applicable law. If you do not consent to any changes to our Privacy Document, you may notify us at our Contact Us (/web/20170126051223/https://www.familytreedna.com/contact.aspx#contactForm) forms with the subject line PRIVACY DOCUMENT. At Gene by Gene's option on a case-by-case basis, we will " either continue to apply the previous Privacy Document or delete your information and/or account.

## Cancellations and Refunds

If you cancel the DNA testing you have ordered prior to the sample being received at our office, a refund may be given, usually less a handling fee that varies based on the amount of time that has passed since the purchase:

- If cancelled within the first year from the initial order, there will be a $15 or 10% deduction from the amount paid, whichever is greater.
- If cancelled between one year and three years from initial order, there will be a 25% deduction from the amount paid.
- If cancelled after three years from initial order, there will be a 50% deduction from the amount paid.

We will not issue refunds on testing that is in process or completed, including transfers. Once a sample has been sent to our office and checked in, the full cost of the test is absolutely non-refundable.

If a new test is ordered on an existing kit, you will have a 24 hour window to make changes to the new order. After 24 hours, we are unable to change or refund your order, as processing will have already been started.

Delays in testing do not entitle customers to a refund since scientific procedures may be delayed for a variety of reasons. Testing times vary between products and may vary depending on lab volume and biological sample quality. Expected result dates are predictions and not a guarantee of delivery. We do not offer any assurances for specific results.

Please note that you must have internet access to view the results on our interactive website. Some items have downloadable and printable components, but many are designed solely for online interaction. Results will not be mailed, and we will not issue refunds for tests bought under the assumption that the results will be mailed.

## Changing an Order

We can change tests ordered on a kit before a sample is returned to our office. Once a test has been checked in, we cannot change the order.

## Test Failure Credits

If your testing fails and we do not have any remaining sample in storage, we will mail a new sample kit to the address we have on file. It is the responsibility of the person who orders a test or upgrade to confirm that the mailing address is current at the time of purchase and while the order is being processed. We will not send out a notification that a new collection kit has been sent.

## MtDNA and Y-DNA Tests (Sanger and NextGen Sequencing)

If additional samples are not obtainable for tests run on Sanger and NextGen Sequencing (mtDNA Full Sequence, Y-DNA37, Y-DNA67, Y-DNA111, and BIG Y), Family Tree DNA may credit or refund, at its sole discretion, the cost of the test minus a $10 USD shipping and handling fee as well as a 25% lab processing fee for orders greater than $79 USD. We do not offer credits or refunds for products when the retail price of the order was equal to or less than $79 USD. This includes sale pricing.

## Family Finder Tests (Microarray Chip Testing)

The Family Finder test uses a microarray chip that is sensitive to the quality of the DNA sample. As a result, our Family Finder testing and refund policy differs from our other tests. We limit Family Finder testing to two attempts. Almost all (98.5%) of Family Finder tests process successfully on the first attempt with a good quality customer swab. Should the first attempt fail, we rerun the test with a second, separate DNA extraction from the secondary sample in our office. If we do not have a secondary sample, a new sample kit will be sent. No refunds will be issued after failed testing if an additional sample is needed and is not obtainable.

The following refund policies apply:

- For Family Finder tests purchased prior to the last 12 months or as an upgrade to a kit ordered over 12 months ago, if the secondary sample fails, you will be sent a new set of vials

and swabs so that we can perform a new test for free.
- For Family Finder tests purchased during the last 12 months, if the secondary sample fails, you will be contacted regarding the possibility of a third testing attempt with a new sample for a $50 US lab fee. The lab fee is charged due to the fact that, for samples that are less than one-year old, the test generally only fails because of the poor quality of the collection.

## Arbitration of Disputes and Governing Law

**Arbitration.** In the unlikely event that Gene by Gene has not been able to resolve a dispute it has with you after attempting to do so informally, we each agree to resolve any claim, dispute, or controversy (excluding any Gene by Gene claims for injunctive or other equitable relief) arising out of or in connection with or relating to this Agreement, or the breach or alleged breach thereof (collectively, "Claims"), by binding arbitration by the American Arbitration Association ("AAA") in the city of Houston, Texas under the commercial rules then in effect for the AAA, except as provided herein. The award rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses, and any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Nothing in this Section shall be deemed as preventing Gene by Gene from seeking injunctive or other equitable relief from the courts as necessary to protect any of Gene by Gene's proprietary interests. ALL CLAIMS MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. YOU AGREE THAT, BY ENTERING INTO THIS AGREEMENT, YOU AND GENE BY GENE ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

**Disputes and Governing Law.** You agree that: (i) the Services shall be deemed solely based in Texas; and (ii) the Services shall be deemed a passive one that does not give rise to personal jurisdiction over Gene by Gene, either specific or general, in jurisdictions other than Texas. This Agreement and any dispute regarding the Services shall be governed by the laws of the State of Texas, USA, without regard to conflict of law provisions and you agree to exclusive personal jurisdiction and venue in the state and federal courts of the United States located in the State of Texas, City of Houston for any actions for which we retain the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a our copyrights, trademarks, trade secrets, patents, or other intellectual property or proprietary rights, as set forth in the Arbitration provision above.

## Questions

If you have any questions about this Privacy Document, the practices of the Gene by Gene Website, or your dealings with the Gene by Gene Website, you can contact us by either calling 1-713-868-1438 or submitting an inquiry through our Contact Us (/web/20170126051223/https://www.familytreedna.com/contact.aspx#contactForm) form.

(https://web.archive.org/web/20170126051223/...

Family Tree DNA is the testing partner for National Geographic's Genographic Project.

### About

Who's Who at FTDNA (/web/20170126051223/https://www.familytreedna.com/about-us.aspx)

Careers (/web/20170126051223/https://www.familytreedna.com/careers.aspx)

Contact Us (/web/20170126051223/https://www.familytreedna.com/contact.aspx)

Products (/web/20170126051223/https://www.familytreedna.com/products.aspx)

### Resources

Audio & Video (/web/20170126051223/https://www.familytreedna.com/audio-video.aspx)

Books & Videos (/web/20170126051223/https://www.familytreedna.com/books-and-videos.aspx)

Glossary Of Terms (/web/20170126051223/https://www.familytreedna.com/learn/glossary/)

Learning Center (/web/20170126051223/https://www.familytreedna.com/learn/)

Scientific Papers (/web/20170126051223/https://www.familytreedna.com/scientific-papers.aspx)

### Community

Projects (/web/20170126051223/https://www.fami

Forums (https://web.archive.org/web/2017012605

News Blog (/web/20170126051223/https://www.fami

FTDNA Branded Merchandise (https://web.archive.org/web/2017012605

© All Contents Copyright 2001-2017 Gene By Gene, Ltd. Privacy Policy, Terms of Service, and Refunds (/web/20170126051223/https://www.familytreedna.com/privacy-policy.aspx) Last Updated 12/12/2016

# EXHIBIT

# 3C

FamilyTreeDNA | Enter a name or place to begin searching | New and improved! | My Cart

DNA Tests | Projects | Resources | SIGN IN to myFTDNA

0%

Register | Upload Data | Wait for Processing | Unlock all Matches

# Discover new matches for FREE

## OR unlock your complete FAMILY FINDER results for only $39

Transfer your 23andMe©(V3) or AncestryDNA™(V1)* today and join the world's most comprehensive genetic genealogy database.

*Please note that AncestryDNA™ has recently changed their file format. The updated version is currently not compatible with our transfer program, however we are working on accepting the newest version in the very near future.

Enter your name and email to get started:

First Name | Last Name

Email Address

Male | Female

Already have a Family Tree DNA account?

Try it Free!

I agree to the Terms of Service and agree to allow FTDNA to make my information available to genetic matches as described in the Release Form.

FamilyTreeDNA

THE GENOGRAPHIC PROJECT

Family Tree DNA is the testing partner for National Geographic's Genographic Project.

| About | Resources | Community |
|---|---|---|
| Who's Who at FTDNA | Audio & Video | Projects |
| Careers | Books & Videos | Forums |
| Contact Us | Glossary Of Terms | News Blog |
| Products | Learning Center | FTDNA Branded Merchandise |
| | Scientific Papers | |
| | Webinars | |

© All Contents Copyright 2001-2017 Gene By Gene, Ltd. Privacy Policy, Terms of Service, and Refunds Last Updated 12/12/2016

# EXHIBIT
# 3D

Gmail

**Kelly Jenkins <[redacted]>**

## Changes to Terms of Service and Privacy Statement

**FamilyTreeDNA** <familytreedna@familytreedna.com> Thu, Apr 11, 2024 at 3:29 PM
Reply-To: FamilyTreeDNA <familytreedna@familytreedna.com>
To: [redacted]

Translate email

FamilyTreeDNA Logo

Dear Valued Member,

We're dedicated to enhancing your FamilyTreeDNA experience and ensuring our policies transparently outline how our services function. With that in mind, we're reaching out to let you know about **several updates to our Terms of Service, Privacy Statement, and Guidelines, effective today, April 11th, 2024**.

As part of our ongoing commitment to clear communication with our valued users, we recommend reviewing these updated policies.

**Here are some of the key updates we've implemented:**

- **Enhanced Clarity**: While our Terms of Service remain a legal document, we've strived to make them more user-friendly by providing clearer definitions.
- **Revised Law Enforcement Guidelines**: We've refined the scope of our Law Enforcement Guide and outlined the appropriate use of our service.
- **Added Privacy Rights**: In the Privacy Statement, we've included your rights and choices regarding your Personal Information and how to exercise them.
- **Appointed EU Representative**: To comply with applicable laws, we have appointed a representative in the European Union to facilitate communication with EU citizens.

Note that none of these updates will impact your ability to continue to use FamilyTreeDNA services.

As always, on behalf of all of us, thank you for being a part of the

FamilyTreeDNA community.

Thanks!
The FamilyTreeDNA Team

*Copyright © 2024 FamilyTreeDNA, All rights reserved.*

This email was sent to kjenkins3722@gmail.com
*why did I get this?* unsubscribe from this list update subscription preferences
FamilyTreeDNA 1445 N Loop W #820 Houston, TX 77008 USA

**Holiday Sale: Discounts on Family Finder (https://www.familytreedna.com/products/family-finder), Y-DNA (https://www.familytreedna.com/products/y-dna), mtDNA (https://www.familytreedna.com/products/mt-dna), & All Bundles (https://www.familytreedna.com/products/bundles)! Now through Jan 1st.**

# Terms of Service

Last modified: April 10, 2024

Effective Date: April 25, 2024

## Summary of Changes

We have revised these Terms. This summary is intended to briefly explain the changes made and help you understand how these changes may affect you. We encourage you to review the modified Terms of Service in full to understand the terms that will govern your use of our Services (as defined below). We have made changes:

- to clarify language concerning your access to and use of the Services; and
- to streamline and improve the legibility of the Terms and Privacy Statement (/legal/privacy-statement); and
- to update the scope of Law Enforcement activities.

---

## 1. Introduction

Welcome to FamilyTreeDNA! FamilyTreeDNA ("**we**," "**us**," or "**our**,") is an online genealogy service that lets its customers trace their ancestry, build a family tree, make and share family discoveries, and connect with relatives. Our services and this website are owned and operated by Gene by Gene, Ltd. with a principal place of business located at 1445 N Loop W, Houston, TX 77008.

The following terms and conditions ("**Terms**") govern your use of FamilyTreeDNA's products, services, software, platform, and https://www.familytreedna.com/ (https://www.familytreedna.com/) (the "**Website**") whether as a guest or a registered account user ("**User**" or "**Customer**"), including, without limitation, (i) submission of your DNA sample for analysis, processing, and storage; (ii) uploading your genetic results from another genetic testing company; (iii) accessing and interacting with genetic genealogy results and wellness reports; and (iv) downloading your raw genetic data. If any new features are added to the Services in the future, such features will also be subject to these Terms (with the Website collectively, the "**Services**").

These Terms incorporate by reference other policies and rules that apply to the Services, including our Privacy Statement (/legal/privacy-statement). We encourage you to read these Terms and other policies carefully to understand your rights and the rules that govern your use of the Services. By using the Services, you accept and agree to enter into a binding contract with us and abide by these Terms. If you do not agree to these Terms or any of our other policies, then please do not use the Services. You may delete your account at any time by contacting Customer Service (/contact). Please contact us (/contact) if you have questions about these Terms or our Services.

We may revise and update these Terms occasionally at our sole discretion. All changes shall be effective immediately once published on our Website. If we make a material change, we will notify you by posting a notice on our Website or sending a notice to the primary email address associated with your account. Your continued use of the Services following the posting of revised Terms shall mean that you accept and agree to such changes.

## 2. Additional Terms and Conditions

FamilyTreeDNA provides the option to participate in one or more Group Projects. By joining a Group Project, you are agreeing to participate and consenting to provide your personal information to Group Projects Administrators. Please read Group Project Participation Informed Consent (/legal/terms/group-project-participation) for specific information related to Group Projects.

English

FamilyTreeDNA may, in limited circumstances and **only** with your express consent, permit the Services to be used for investigative genetic genealogy ("IGG") matching. Please refer to our Law Enforcement Guide (/legal/law-enforcement-guide), which applies in addition to these Terms.

## 3. Eligibility to Use the Services

By creating an account or using the Services, you represent and warrant that:

- you are 18 years of age or older;
- any DNA sample you provide or genetic results you upload or transfer to us is either your own or that of a minor for whom you are a parent or legal guardian. **Please note**, children under the age of 13 are not permitted to use the Services. If we become aware that we have unknowingly collected personal information directly from a child under the age of 13, we will take commercially reasonable efforts to delete such information from our database;
- you are not an individual prohibited from receiving the Services under the laws of the jurisdiction within which you reside or from which you wish to use the Services; and
- you are not using our Services on behalf of an insurance company or an employer.

## 4. Website and Interactive Features

A core aspect of the Services is to use DNA testing to determine your ancestry and to allow you to connect with DNA relatives found in our database. As such, FamilyTreeDNA allows you, as a registered account User, to post, submit, publish, display, or transmit to other Users ("**post**") content or materials (collectively, "**User Content**") on or through forums, profiles, bulletin boards, and other interactive features on the Website. You may use the Services and Website only for lawful purposes and in accordance with these Terms. By providing any User Content, you grant us and our affiliates and service providers, and each of their and our respective licensees, successors, and assignees the right to use, reproduce, modify, perform, display, distribute, and otherwise disclose to third parties any such User Content according to your account settings.

You understand and acknowledge that you are responsible for any User Content you submit or contribute and must refrain from posting any illegal or inappropriate content. We do not monitor or review material before it is posted on the Website, but we reserve the right to remove any User Content that breaches these Terms at our sole discretion. We are not responsible or liable to any third party for the content or the accuracy of any User Content posted by you or any other User of the Website.

You represent and warrant that you will not, by way of example and without limitation, post User Content that:

- may violate the privacy of others, including providing any personal information of other individuals without their consent.
- harms minors in any way or that otherwise relates to a minor, including any personal information or otherwise without the direct consent of their parent or guardian.
- impairs or infringes the intellectual property or other rights of any other person, including copyrights and trademarks.
- promotes any illegal activity or advocates or promotes unlawful acts.
- you do not own or do not have the right to use.
- contains any nudity, sexuality, pornography, violence, or any other offensive or otherwise objectionable subject matter.
- is defamatory, obscene, indecent, derogatory, abusive, violent, hateful, false, misleading, inaccurate, untrue, malicious, harassing, threatening, or any User Content that incites racial, religious, or ethnic hatred.

Additionally, you agree not to:

- advertise or transmit promotional material, including any "junk mail," "chain letters," "spam," or any other similar solicitation for any business or commercial purpose.
- exploit or use the Services or any portion thereof for any commercial purpose.

English

- impersonate or attempt to impersonate any person or entity, including but not limited to any employee or representative of FamilyTreeDNA or any of its affiliates, or misrepresent your identity or affiliation with a person or entity.
- stalk or harass other Customers.
- use the Website in any manner that could disable, overburden, damage, or impair the Website or Services or interfere with any other User's use of the Website or Services, including their ability to engage in real-time activities through the Website.
- use any robot, spider, or other devices or any other means to access, scrape, or crawl any pages or other services on the Website for any purpose, including monitoring or copying any of the material on the Website.
- use any manual process to monitor or copy any of the material on the Website or for any other purpose not expressly authorized in these Terms without our prior written consent.
- use any information received through the Services to attempt to identify or to contact other Users (other than through features for contacting other Users such as Matching offered pursuant to the Services) or for any purpose not expressly permitted under these Terms without our express prior written consent.
- use any device, software, or routine that interferes with the proper working of the Website.
- introduce any viruses, Trojan horses, worms, logic bombs, or other material that is malicious or technologically harmful.
- attempt to gain unauthorized access to, interfere with, damage, or disrupt any parts of the Website, the server on which the Website is stored, or any server, computer, or database connected to the Website.
- attempt to interfere with the proper working of the Website or Services.
- violate, in any way, any applicable federal, state, local, or international law or regulation.

These Terms permit you to use the Website and Services for your personal, non-commercial, use only. You must not access or use for any commercial purposes any part of the Website or any Services or materials available through the Website. Except with our express prior written consent or as otherwise permitted under these Terms, you must not reproduce, distribute, modify, create derivative works of, publicly display, publicly perform, republish, download, store, or transmit any of the material on our Website nor systematically download any data or material from or through the Website for any purpose, such as to make or populate another database. Except with our express prior written consent, reselling any FamilyTreeDNA products (including, without limitation, FamilyTreeDNA test kits) is strictly prohibited.

To access certain Services offered through the Website, you may need to register an account. If you choose or are provided with a password or any other piece of information as part of our security procedures, you must treat such information as confidential, and you must not disclose it to any other person or entity. You also acknowledge that, once created, your account is personal to you and agree not to provide any other person with access to your account or portions of it using your kit number, password, or other security information. You agree to notify us immediately of any unauthorized access to or use of your username or password or any other breach of security. We have the right to disable any kit number, password, or other identifier, whether chosen by you or provided by us, at any time in our sole discretion, including if, in our opinion, you have violated any provision of these Terms.

Depending on your account settings, once uploaded or posted, User Content may be viewable or accessible by other Users. You acknowledge and agree that other Users may access your family tree and may modify or otherwise amend your family tree. Information that you post will be displayed and is available for others to search or view.

We reserve the right to: (i) remove or refuse to post any User Content for any or no reason in our sole discretion or otherwise take any action with respect to any User Content that we deem necessary or appropriate in our sole discretion, including if we believe that such User Content violates these Terms; (ii) take appropriate legal action, including without limitation, referral to Law Enforcement, for any illegal or unauthorized use of the Website or Services; (iii) terminate or suspend your access to all or part of the Website for any reason, including without limitation, any violation of these Terms of Use.

English

Without limiting the foregoing, we have the right to cooperate fully with any Law Enforcement authorities or court order requesting or directing us to disclose the identity or other information of anyone posting any materials on or through the Website. YOU WAIVE AND HOLD HARMLESS FAMILYTREEDNA AND ITS AFFILIATES, LICENSEES, AND SERVICE PROVIDERS FROM ANY CLAIMS RESULTING FROM ANY ACTION TAKEN BY FAMILYTREEDNA DURING, OR TAKEN AS A CONSEQUENCE OF, INVESTIGATIONS BY EITHER FAMILYTREEDNA OR LAW ENFORCEMENT AUTHORITIES.

## 5. The Services

The Services are intended to provide you with information about your ancestry and ethnicity and other tools and insights that allow you to learn more about your DNA, in each case, for your personal use. As such, the Services include ordering FamilyTreeDNA's test kits, the processing, handling and use of your DNA Sample, and the results, reports, and data resulting therefrom or submitted by you.

Use of the Services is void where prohibited. To register a FamilyTreeDNA test kit or to access and use the Services, you will be asked to create an account on the Website and will need to provide certain registration details and other information. It is a condition of your use of the Services that all the information you provide is correct, current, and complete. All Personal Information we collect through your use of the Services is subject to our Privacy Statement (/legal/privacy-statement).

We acknowledge that you own your Genetic Data, including your DNA Sample. By submitting a DNA Sample to us, you give FamilyTreeDNA permission to: (i) extract the DNA from your DNA Sample; (ii) perform genetic analysis of the DNA using methods available now or developed in the future; (iii) disclose the results of the applicable analysis performed to you ("**Genetic Results**") and/or to others whom you authorize, and to allow you to download your Genetic Results ("**Raw DNA Data**," and collectively with your DNA Sample, "**Genetic Data**"), in each case subject to and in accordance with this Agreement and Privacy Statement (/legal/privacy-statement). With your additional consent, we will store your DNA Sample for further genetic testing at your request (for example, we may be able to provide additional Genetic Results or Genetic Data and other insights through further genetic testing, subject to your explicit approval). You hereby release FamilyTreeDNA from any and all claims, liens, demands, actions, or suits in connection with your DNA Sample, Genetic Results and/or Genetic Data, including, without limitation, errors, omissions, claims involving defamation, invasion of privacy, right of publicity, emotional distress or economic loss. This section will survive even if you stop using the Services. In addition, you acknowledge that by providing your DNA Sample and/or Genetic Results, you acquire no rights in any research or products that may be developed by FamilyTreeDNA that may relate to your DNA. You understand that you will not receive compensation for any research or commercial products that include or result from your information.

You understand and agree that in the event that you download your Raw DNA Data: (i) such downloaded copy is or will no longer be protected by FamilyTreeDNA; (ii) such downloaded and locally stored copy of your Raw DNA Data shall be downloaded and stored at your own risk; (iii) FamilyTreeDNA will not have any control over such Raw DNA Data and shall not be liable to you or to any third party in connection with such Raw DNA Data; and (iv) your Raw DNA Data should not be used for medical, diagnostic, paternity or other testing purposes. We will, upon your request, destroy your DNA Sample and/or delete your Genetic Data; please refer to the step-by-step instructions provided in the Privacy Statement (/legal/privacy-statement). Genetic information shared with others could be used against your interests and therefore, you should exercise caution when sharing it with others.

You understand that when using our Services, you may uncover unforeseen information about yourself or your family. Additionally, you may encounter content that you deem offensive, inaccurate, or objectionable. Despite potential strong emotional reactions, both on your part and among those with whom you share these findings, you explicitly acknowledge and accept all associated risks with using the Services. FamilyTreeDNA shall not be held responsible for any social, emotional, or legal repercussions arising from such discoveries or encounters.

English

We run and operate our own CLIA certified lab at our headquarters in Houston, Texas, where we place great attention on quality. From time to time, and on rare occasions, the laboratory may not be able to process your DNA Sample or the laboratory process may result in errors. Your DNA Sample may not be processed if your sample does not contain sufficient DNA or saliva or if your sample is contaminated. Please see our Order Modifications & Refund Policy (/legal/refund-policy) for information on how we re-process failed DNA Samples and our policy on refunding or reprocessing such samples at no charge. Please contact Customer Service (/contact) if you believe your DNA Sample was misidentified.

TO THE FULLEST EXTENT PROVIDED BY LAW, IN NO EVENT WILL FAMILYTREEDNA BE LIABLE FOR ANY IMPLICATIONS OR ACTIONS RESULTING FROM YOUR PARTICIPATION IN THE SERVICES. FAMILYTREEDNA HEREBY DISCLAIMS ANY AND ALL LIABILITY WITH REGARD TO ANY IMPLICATIONS OR ACTIONS RESULTING FROM YOUR PARTICIPATION IN THE SERVICES. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO THE GENETIC RESULTS, GENETIC DATA OR AS TO THEIR ACCURACY, COMPLETENESS, RELIABILITY, COMPREHENSIVENESS, QUALITY, ERROR-FREE, COMPATIBILITY, SECURITY, AND FITNESS FOR A PARTICULAR PURPOSE.

## 6. Limited License

Other than User Content, all features, and functionality, including but not limited to all information, software, text, displays, images, video, and audio, and the design, selection, and arrangement contained on or within the Services ("**FamilyTreeDNA Content**") is owned, controlled or licensed by FamilyTreeDNA and is protected by United States and international copyright, trademark, patent, trade secret, and other intellectual property or proprietary rights laws. Subject to compliance with these Terms, FamilyTreeDNA grants you a limited license to copy and distribute, free of charge, your Raw DNA Data and similar materials purposely made available by FamilyTreeDNA for downloading from the Website, provided that you do **not**: (i) remove any proprietary notice on all such documents; (ii) post such information on any networked computer or broadcast it in any media; (iii) make modifications to any such information; (iv) make any additional representations or warranties relating to such copies or materials; and (v) use such materials for any non-personal, commercial purpose.

The FamilyTreeDNA name, the FamilyTreeDNA logo, and all related names, logos, product and service names, designs, and slogans are trademarks of FamilyTreeDNA, its affiliates, or licensors. You must not use such marks without the prior written permission of FamilyTreeDNA. All other names, logos, product and service names, designs, and slogans on this Website are the trademarks of their respective owners.

## 7. Digital Millennium Copyright Act

We take claims of copyright infringement seriously. We will respond to notices of alleged copyright infringement that comply with applicable law. If you believe any materials accessible on or from this Website, including any User Content, infringe your copyright, you may request removal of those materials (or access to them) from the Website by submitting written notification to our copyright agent designated below. It is the policy of FamilyTreeDNA to terminate the user accounts of repeat infringers.

In accordance with the Online Copyright Infringement Liability Limitation Act of the Digital Millennium Copyright Act (17 U.S.C. § 512) ("**DMCA**"), the written notice (the "**DMCA Notice**") must include substantially the following:

- Your physical or electronic signature.
- Identification of the copyrighted work you believe to have been infringed or, if the claim involves multiple works on the Website, a representative list of such works.
- Identification of the material you believe to be infringing in a sufficiently precise manner to allow us to locate that material.
- Adequate information by which we can contact you (including your name, postal address, telephone number, and, if available, email address).
- A statement that you have a good faith belief that use of the copyrighted material is not authorized by the copyright owner, its agent, or the law.
- A statement that the information in the written notice is accurate.
- A statement, under penalty of perjury, that you are authorized to act on behalf of the copyright owner.

English

Our designated copyright agent to receive DMCA Notices is:

**FamilyTreeDNA Customer Service**
1445 N Loop West
Suite 820
Houston, TX 77008
+1.713.868.1438
privacy@genebygene.com (mailto:privacy@genebygene.com)

If you fail to comply with all of the requirements of Section 512(c)(3) of the DMCA, your DMCA Notice may not be effective.

Please be aware that if you knowingly materially misrepresent that material or activity on the Website infringes your copyright, you may be held liable for damages (including costs and attorneys' fees) under Section 512(f) of the DMCA.

## 8. Reliance on Information Posted

The information presented on or through the Website is made available solely for general information purposes. We do not warrant the accuracy, completeness, or usefulness of this information. Any reliance you place on such information is strictly at your own risk. We disclaim all liability and responsibility arising from any reliance placed on such materials by you or any other visitor to the Website or by anyone who may be informed of any of its contents.

This Website may include content provided by third parties, including materials provided by other users, bloggers, and third-party licensors, syndicators, aggregators, and/or reporting services. All statements and/or opinions expressed in these materials and all articles and responses to questions and other content, other than the content provided by FamilyTreeDNA, are solely the opinions and the responsibility of the person or entity providing those materials. These materials do not necessarily reflect the opinion of FamilyTreeDNA. We are not responsible or liable to you or any third party for the content or accuracy of any materials provided by any third parties.

## 9. Indemnification

You agree to indemnify and hold harmless FamilyTreeDNA (and if requested by FamilyTreeDNA, defend), its affiliates, licensors, licensees, and service providers, and its and their respective officers, directors, employees, contractors, agents, licensors, licensees, suppliers, successors, and assignees from and against any claims, liabilities, damages, judgments, awards, losses, costs, expenses, or fees (including reasonable attorneys' fees) made by any third party arising out of or relating to your violation of these Terms or violation of any rights of another, your use of the Services, including, but not limited to your User Content, any use of the Services and/or FamilyTreeDNA products other than as expressly authorized in these Terms.

If you have submitted a DNA Sample or otherwise provided your own information, you will indemnify and hold harmless FamilyTreeDNA (and if requested by FamilyTreeDNA, defend), its employees, contractors, successors, and assignees from any liability arising out of the use or disclosure of any genetic data obtained from analyzing your sample and/or analyzing your data, which is disclosed to you consistent with our Privacy Statement (/legal/privacy-statement) or results from any third-party add-on tools we provide. In addition, if you provide your information to third parties, including individuals to whom you facilitate access, intentionally or inadvertently, or to third parties for diagnostic or other purposes, you agree to defend and hold harmless FamilyTreeDNA, its employees, contractors, successors, and assignees from any and all liability arising from such disclosure or use of your data.

## 10. Disclaimer of Warranties

YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT: (1) YOUR USE OF THE SERVICES ARE AT YOUR SOLE RISK. THE SERVICES ARE PROVIDED ON AN “AS IS” AND “AS AVAILABLE” BASIS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FAMILYTREEDNA EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT; (2) FAMILYTREEDNA MAKES NO WARRANTY THAT: (a) THE

English

SERVICES WILL MEET YOUR REQUIREMENTS; (b) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, UNFAILINGLY SECURE, OR ERROR-FREE; (c) THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SERVICES WILL BE ACCURATE OR RELIABLE; (d) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU THROUGH THE SERVICES WILL MEET YOUR EXPECTATIONS; OR (e) ANY ERRORS IN THE SOFTWARE WILL BE CORRECTED; (3) ANY RAW DATA OR OTHER MATERIALS DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SERVICES IS DONE AT YOUR OWN DISCRETION AND RISK AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER OR LOSS OF DATA THAT RESULTS FROM DOWNLOADING ANY SUCH MATERIAL; (4) NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM FAMILYTREEDNA OR THROUGH OR FROM THE SERVICES SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THE TERMS AND SHALL NOT BE RELIED UPON AS MEDICAL ADVICE;. (5) YOU SHOULD ALWAYS USE CAUTION WHEN GIVING OUT ANY PERSONAL INFORMATION ABOUT YOURSELF OR THOSE FOR WHOM YOU HAVE LEGAL AUTHORITY. FAMILYTREEDNA DOES NOT CONTROL OR ENDORSE ANY ACTIONS RESULTING FROM YOUR PARTICIPATION IN THE SERVICES AND, THEREFORE, FAMILYTREEDNA SPECIFICALLY DISCLAIMS ANY LIABILITY WITH REGARD TO ANY ACTIONS RESULTING FROM YOUR PARTICIPATION IN THE SERVICES.

## 11. Limitation on Liability

TO THE FULLEST EXTENT PROVIDED BY LAW, IN NO EVENT WILL FAMILYTREEDNA, ITS AFFILIATES, OR THEIR LICENSORS, SERVICE PROVIDERS, EMPLOYEES, AGENTS, OFFICERS, OR DIRECTORS BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY, PAIN AND SUFFERING, EMOTIONAL DISTRESS, LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, LOSS OF DATA, OR OTHER INTANGIBLE LOSSES ARISING OR RESULTING FROM: (i) THE USE OR THE INABILITY TO USE THE SERVICES; (ii) ANY ACTION YOU TAKE BASED ON THE INFORMATION YOU RECEIVE IN, THROUGH OR FROM THE SERVICES, (iii) YOUR FAILURE TO KEEP YOUR PASSWORD OR ACCOUNT DETAILS SECURE AND CONFIDENTIAL, (iv) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR DATA OR TRANSMISSIONS THEREOF; (v) THE IMPROPER AUTHORIZATION FOR THE SERVICES BY SOMEONE CLAIMING SUCH AUTHORITY; or (vi) STATEMENTS OR CONDUCT OF ANY THIRD PARTY ON THE SERVICES, AND IN EACH CASE (i) – (vi), WHETHER CAUSED BY TORT (INCLUDING NEGLIGENCE), BREACH OF CONTRACT, OR OTHERWISE, EVEN IF FORESEEABLE. IF APPLICABLE LAW DOES NOT ALLOW THE FOREGOING DISCLAIMER OF ALL DAMAGES, IN NO EVENT WILL FAMILYTREEDNA'S LIABILITY TO YOU EXCEED THE AMOUNTS YOU HAVE PAID TO USE THE SERVICES. THE FOREGOING EXCLUSIONS AND LIMITS OF LIABILITY APPLY EVEN IF REMAINING REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.

## 12. Links from the Website

If the Website contains links to other sites and resources provided by third parties, these links are provided for your convenience only. This includes links contained in advertisements, including banner advertisements and sponsored links. We have no control over the contents of those sites or resources and accept no responsibility for them or for any loss or damage that may arise from your use of them. If you decide to access any of the third-party websites linked to this Website, you do so entirely at your own risk and subject to the terms and conditions of use for such websites.

## 13. Governing Law and Jurisdiction

All matters relating to the Services and these Terms, and any dispute or claim arising therefrom or related thereto (in each case, including non-contractual disputes or claims), shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

Any legal suit, action, or proceeding arising out of, or related to, these Terms or the Services shall be instituted exclusively in the federal courts of the United States or the courts of the State of Texas, in each case located in the City of Houston and County c

English

Harris, although we retain the right to bring any suit, action, or proceeding against you for breach of these Terms in your country of residence or any other relevant country. You waive any and all objections to the exercise of jurisdiction over you by such courts and to venue in such courts.

## 14. Arbitration

At FamilyTreeDNA's sole discretion, it may require you to submit any disputes arising from these Terms or use of the Services, including disputes arising from or concerning their interpretation, violation, invalidity, non-performance, or termination, to final and binding arbitration under the Rules of Arbitration of the American Arbitration Association applying Texas law.

## 15. Limitation on Time to File Claims

ANY CAUSE OF ACTION OR CLAIM YOU MAY HAVE ARISING OUT OF OR RELATING TO THESE TERMS OR THE SERVICES MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES; OTHERWISE, SUCH CAUSE OF ACTION OR CLAIM IS PERMANENTLY BARRED.

## 16. Waiver and Severability

No waiver by FamilyTreeDNA of any term or condition set out in these Terms shall be deemed a further or continuing waiver of such term or condition or a waiver of any other term or condition, and any failure of FamilyTreeDNA to assert a right or provision under these Terms shall not constitute a waiver of such right or provision.

If any provision of these Terms is held by a court or other tribunal of competent jurisdiction to be invalid, illegal, or unenforceable for any reason, such provision shall be eliminated or limited to the minimum extent such that the remaining provisions of the Terms will continue in full force and effect.

## 17. Entire Agreement

The Terms and our Privacy Statement (/legal/privacy-statement) and any applicable express consent throughout the use of our Services constitute the sole and entire agreement between you and FamilyTreeDNA regarding the Services and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding the Services.

## 18. Your Comments and Concerns

All feedback, comments, requests for technical support, and other communications relating to the Services should be submitted to our Customer Support team via the following link: https://www.familytreedna.com/contact (/contact).

Read the previous version of this document. (/legal/terms-of-service/04112024) *Last updated April 10, 2024*

mtDNA (/products/mt-dna)

Gift Cards (/products/gift-cards)

**COMMUNITY**

Group Projects (/group-project-search)

Forums (http://forums.familytreedna.com/)

Y-DNA Haplotree (/public/y-dna-haplotree)

mtDNA Haplotree (/public/mt-dna-haplotree)

**LEGAL**

Terms of Service (/legal/terms-of-service)

Privacy Statement (/legal/privacy-statement)

Cookie Policy (/legal/cookie-policy)

Cookie Settings (/legal/cookie-declaration)

All Policies (/legal)

**SUPPORT**

Help Center (https://help.familytreedna.com/hc/en-us)

Glossary (https://www.familytreedna.com/learn/glossary)

Contact Us (/contact)

FamilyTreeDNA (/)

(https://https://https://https://

All Contents Copyright 2001-2024 Gene by Gene, Ltd.

English